1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LARRY BRIAN PORTEOUS,                    No.  2:15-cv-1817 GEB KJN P

12                Petitioner,

13        v.                                  ORDER AND FINDINGS &
                                              RECOMMENDATIONS
14   RAYTHEL FISHER, JR., Warden,

15                Respondent.

16

17   I.  Introduction

18        Petitioner is a state prisoner, proceeding pro se and in forma pauperis.  Petitioner filed an

19   application for petition of writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the

20   court is respondent's motion to dismiss the habeas petition as barred by the statute of limitations,

21   as well as petitioner's motion to compel discovery of certain mental health records.  For the

22   reasons set forth below, petitioner's motion to compel is denied, and respondent's motion to

23   dismiss should be granted.

24   II.  Chronology

25        The relevant chronology of this case is as follows:

26        1.  On April 25, 1996, petitioner was convicted of forcible rape, residential burglary, and

27   false imprisonment by violence.  (Respondent's Lodged Document ("LD") 1.)  A number of

28   enhancement allegations were found true.  (LD 1.)

                                              1

2. Petitioner was sentenced to an indeterminate state prison term of twenty-nine years to life.  (LD 1-2.)

3. Petitioner filed an appeal.  On February 27, 1997, the California Court of Appeal for the Third Appellate District affirmed the conviction.  (LD 2.)

4. Petitioner did not file a petition for review in the California Supreme Court.

5. On October 4, 2014,[1] petitioner filed a petition for writ of habeas corpus in the San Joaquin County Superior Court.  (LD 3.)  On December 17, 2014, the superior court denied the petition in a reasoned decision.  (LD 4.)

6. On January 11, 2015, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  (LD 5.)  The appellate court denied the petition on February 26, 2015.  (LD 6.)

7. On March 6, 2015, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (LD 7.)  On May 20, 2015, the California Supreme Court denied the petition without comment.  (LD 8.)

8. On June 16, 2015, petitioner constructively filed the instant federal petition.  (ECF No. 1.)  See Rule 3(d) of the Federal Rules Governing Section 2254 Cases.

9. Respondent filed the motion to dismiss on October 29, 2015.  (ECF No. 11.)  Petitioner filed an opposition.  (ECF No. 17.)  Respondent filed a reply.  (ECF No. 21.)  On February 16, 2016, petitioner filed a supplemental opposition to the motion to dismiss.  (ECF No. 22.) On March 1, 2016, petitioner was granted leave, nunc pro tunc, to file his supplemental opposition, and respondent was granted leave to file a supplemental response.  (ECF No. 25.)  On March 4, 2016, petitioner filed a motion to compel respondent to produce petitioner's mental health records.  (ECF No. 27.)  On March 17, 2016, respondent filed a supplemental reply and

---

[1]  Unless otherwise indicated, all of petitioner's subsequent court filings were given benefit of the mailbox rule.  See Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010) (under the mailbox rule, the petition is deemed filed when handed to prison authorities for mailing).  Under the mailbox rule, the date petitioner signed the petition is considered his filing date absent evidence to the contrary.  See Jenkins v. Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003) (date petition is signed may be considered earliest possible date an inmate could submit his petition to prison authorities for filing under the mailbox rule).

1  opposition to petitioner's motion to compel.  (ECF No. 29.)  On March 24, 2016, petitioner filed a

2  supplemental declaration providing the correct address for obtaining petitioner's mental health

3  records.  (ECF No. 30.)

4  III.  Legal Standards - Motion to Dismiss

5        Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a

6  petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the

7  petitioner is not entitled to relief in the district court. . . ."  Id.  The Court of Appeals for the Ninth

8  Circuit has referred to a respondent's motion to dismiss as a request for the court to dismiss under

9  Rule 4 of the Rules Governing § 2254 Cases.  See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420

10  (1991).  Accordingly, the court will review respondent's motion to dismiss pursuant to its

11  authority under Rule 4.

12        On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") was

13  enacted.  Section 2244(d)(1) of Title 8 of the United States Code provides:

14        A 1-year period of limitation shall apply to an application for a writ
15        of habeas corpus by a person in custody pursuant to the judgment of
      a State court.  The limitation period shall run from the latest of –

16          (A) the date on which the judgment became final by the
17          conclusion of direct review or the expiration of the time for seeking
          such review;

18          (B) the date on which the impediment to filing an application
19          created by State action in violation of the Constitution or laws of
          the United States is removed, if the applicant was prevented from
20          filing by such State action;

21          (C) the date on which the constitutional right asserted was
          initially recognized by the Supreme Court, if the right has been
22          newly recognized by the Supreme Court and made retroactively
          applicable to cases on collateral review; or

23          (D) the date on which the factual predicate of the claim or claims
          presented could have been discovered through the exercise of due
24          diligence.

25  28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) provides that "the time during which a properly filed

26  application for State post-conviction or other collateral review with respect to the pertinent

27  judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C.

28  § 2244(d)(2).

3

Section 2244(d)(2) provides that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C. § 2244(d)(2).  Generally, this means that the statute of limitations is tolled during the time after a state habeas petition has been filed, but before a decision has been rendered.  Nedds v. Calderon, 678 F.3d 777, 780 (9th Cir. 2012).  However, "a California habeas petitioner who unreasonably delays in filing a state habeas petition is not entitled to the benefit of statutory tolling during the gap or interval preceding the filing."  Id. at 781 (citing Carey v. Saffold, 536 U.S. 214, 225-27 (2002)).  Furthermore, the AEDPA "statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case 'pending' during that interval."  Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999), overruled on other grounds by Carey, 536 U.S. at 214.  In Carey, the United States Supreme Court held that the limitation period is statutorily tolled during one complete round of state post-conviction review, as long as such review is sought within the state's time frame for seeking such review.  Id., 536 U.S. at 220, 222-23.  State habeas petitions filed after the one-year statute of limitations has expired do not revive the statute of limitations and have no tolling effect. Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed"); Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001).

IV.  Statutory Tolling

Petitioner does not dispute that the statute of limitations expired long before the instant petition was filed.  However, to assist the court in evaluating petitioner's claim that he is entitled to equitable tolling, the court first addresses the issue of statutory tolling.

On February 27, 1997, the California Court of Appeal for the Third Appellate District affirmed the conviction.  Petitioner did not seek review in the California Supreme Court.  Thus, the state appeal process became final within the meaning of section 2244(d)(1)(A) when the time for filing a petition for review expired on April 8, 1997, forty days after the California Court of Appeal filed its decision.  See Cal. Ct. R. 8.264(b)(1), 8.500(e); Waldrip v. Hall, 548 F.3d 729,

4

735 (9th Cir. 2008).  The one-year limitations period commenced running the following day, April 9, 1997.  Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).  Therefore, petitioner had until April 8, 1998, to file his federal habeas petition.  However, he did not file the instant petition until June 16, 2015.  Absent tolling, the federal petition is barred by the statute of limitations.

Petitioner filed no post-conviction challenges in state court, so he is not entitled to additional tolling of the limitations period.  28 U.S.C. § 2244(d)(2).

Because the limitations period expired on April 8, 1998, and petitioner filed the instant petition on June 16, 2015, over 17 years too late, the instant petition is time-barred unless he can demonstrate that he is entitled to equitable tolling.

V.  Equitable Tolling

"Equitable tolling may be available '[w]hen external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim.'"  McMonagle v. Meyer, 802 F.3d 1093, 1099 (9th Cir. 2015) (quoting Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999)).  "A petitioner who seeks equitable tolling of AEDPA's one-year filing deadline must show that (1) some 'extraordinary circumstance' prevented him from filing on time, and (2) he has diligently pursued his rights."  Luna v. Kernan, 784 F.3d 640, 646 (9th Cir. 2015) (citing Holland v. Florida, 560 U.S. 631, 649 (2010)).  A petitioner must provide specific facts regarding what was done to pursue the petitioner's claims to demonstrate that equitable tolling is warranted.  Roy v. Lampert, 465 F.3d 964, 973 (9th Cir. 2006).

"The threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule."  Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (citation omitted).

> To apply the doctrine in "extraordinary circumstances" necessarily suggests the doctrine's rarity, and the requirement that extraordinary circumstances "stood in his way" suggests that an external force must cause the untimeliness, rather than, as we have said, merely "oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.

Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir.) (internal citation omitted), cert.

1  denied, 130 S. Ct. 244 (2009); see also Stillman v. LaMarque, 319 F.3d 1199, 1203 (9th Cir.

2  2003) (petitioner must show that the external force caused the untimeliness).  It is petitioner's

3  burden to demonstrate that he is entitled to equitable tolling.  Espinoza-Matthews v. People of the

4  State of California, 432 F.3d 1021, 1026 (9th Cir. 2005).

5        In opposition, petitioner contends that he suffers from an extensive mental illness and is

6  currently housed in an Enhanced Outpatient Program (EOP)[2] within the CDCR.  (ECF No. 17 at

7  1.)  In his supplemental opposition to the pending motion, petitioner argues that he is entitled to

8  equitable tolling because "district court errors affirmatively misled petitioner into believing he

9  had no deadline to exhaust state court remedies and return to federal court," and because of his

10 severe mental illness, he was "unable personally to understand the need to prepare his petitions to

11 file in a timely manner."  (ECF No. 22 at 2; 9-12; 21-29.)  Petitioner claims that under the totality

12 of circumstances it was impossible for him to meet the filing deadline despite his diligence.  (ECF

13 No. 22 at 2-3; 13-18.)  In addition to his mental health records, petitioner provided his own

14 declaration, the declaration of Stephen Snow, the jail house lawyer who prepared petitioner's

15 supplemental opposition, a list of side effects of psychotropic medications, and a description of

16 Post Incarceration Syndrome and Relapse.  Petitioner also claims that prison officials failed to

17 provide adequate mental health care for petitioner in violation of the Eighth Amendment, and that

18 such failure prevented him from filing a timely petition for writ of habeas corpus.  (ECF No. 22 at

19 6-8.)  Petitioner argues that he should be entitled to an evidentiary hearing because he has made a

20 non-frivolous showing that he had a severe mental impairment during the filing period.  (ECF No.

21 22 at 13-19.)

22       Further, petitioner argues that the combination of solitary confinement in administrative

23 segregation ("ad seg"), admission to the Department of Mental Health ("DMH") at Vacaville

24 Psychiatric Program ("VPP"), prison lockdowns, lost legal papers, the unavailability of AEDPA

25  [2] "The EOP level of care is for inmates who suffer "Acute Onset or Significant Decompensation
26  of a serious mental disorder characterized by increased delusional thinking, hallucinatory
    experiences, marked changes in affect, and vegetative signs with definitive impairment of reality
27  testing and/or judgment," and who are unable to function in the general prison population but do
    not require twenty-four hour nursing care or inpatient hospitalization.  Coleman v.
28  Schwarzenegger, 922 F. Supp. 2d 882, 903 n.24 (E.D. Cal. 2009)

6

1    in the Salinas Valley State Prison ("SVSP") law library, and petitioner's mental disorders and

2    side effects from the psychotropic medications, prevented petitioner from understanding the need

3    to prepare his petition for writ of habeas corpus in a timely manner, and under the totality of

4    circumstances, it was impossible for him to meet the filing deadline, despite his diligence.  (ECF

5    No. 22 at 12; 33.)  Petitioner contends that the failure to consider his claims on the merits would

6    result in a fundamental miscarriage of justice.  (ECF No. 22 at 19-21.)

7          A.  Court Allegedly Misled Petitioner

8          Petitioner argues, *inter alia*, that in addressing his prior federal petition, the district court

9    misled him into believing that he had no deadline to exhaust his state court remedies because the

10   dismissal was "without prejudice," failed to allow him to amend to cure the deficiencies, and

11   failed to advise him of stay-and abeyance procedures

12         On February 29, 2000, petitioner filed a petition for writ of habeas corpus in this court.

13   Porteous v. People of the State of California, Case No. 2:00-cv-0431 GEB DAD (E.D. Cal.).  On

14   July 20, 2000, the petition was dismissed for failure to exhaust state remedies.  Petitioner's

15   argument that the court misled petitioner into believing he had no deadline is belied by the

16   express terms of the court's June 7, 2000 findings and recommendations:

17
                Petitioner is cautioned that the habeas corpus statute imposes a one
                year statute of limitations for filing non-capital habeas corpus
18              petitions in federal court.  In most cases, the one year period will
                start to run on the date on which the state court judgment became
19              final by the conclusion of direct review or the expiration of time for
                seeking direct review, although the statute of limitations is tolled
20              while a properly filed application for state post-conviction or other
                collateral review is pending.  28 U.S.C. § 2244(d).
21

22   Case No. 2:00-cv-0431 GEB DAD (ECF No. 2 at 2, n.2).  Because the district court specifically

23   informed petitioner about the statute of limitations period, directing him to the governing statute,

24   petitioner could not have believed that there was no deadline to challenge his conviction.

25         Moreover, on this record, stay and abeyance was not available to petitioner.  Petitioner did

26   not file a petition for review in the California Supreme Court.  Petitioner concedes that he does

27   not recall the claims raised in Case No. 2:00-cv-0431 GEB DAD, and no longer has a copy of the

28   petition filed in that case.  (ECF No. 22 at 34.)  But in any event, the court found that petitioner

1   failed to allege that he had presented *any* of his claims to the California Supreme Court, or to

2   allege that state court remedies were no longer available to him.  Id. (ECF No. 2 at 2).  Petitioner

3   did not file objections to the findings and recommendations, and they were adopted, *in toto*, by

4   the district court because petitioner failed to exhaust *all* of his claims.  Id. (ECF No. 4).  The

5   district court had no authority to stay a wholly unexhausted federal habeas petition.  Coleman v.

6   Thompson, 501 U.S. 722, 731 (1991) ("This Court has long held that a state prisoner's federal

7   habeas petition should be dismissed if the prisoner has not exhausted state remedies as to any of

8   his federal claims"); see Rhines v. Weber, 544 U.S. 269 (2005) (authorizing stay and abeyance of

9   a mixed federal habeas corpus petition); King v. Ryan, 564 F.3d 1133 (9th Cir. 2009) (after

10   Rhines, district court may still stay a petition that has been amended to state only exhausted

11   claims, pursuant to Kelly v. Small, 35 F.3d 1063 (2003)); Rasberry v. Garcia, 448 F.3d 1150 (9th

12   Cir. 2006) (declining to extend the Rhines stay and abeyance procedure to wholly unexhausted

13   petitions).  It was only recently that the Ninth Circuit held that a district court may stay and hold

14   in abeyance, rather than dismiss, a state prisoner's federal habeas petition that raises only

15   unexhausted claims.  Mena v. Long, 813 F.3d 907 (9th Cir. 2016).

16       Because petitioner's prior habeas case was properly dismissed, the claims raised in the

17   instant petition cannot relate back to claims raised in his prior petition.  Rasberry, 448 F.3d at

18   1155 ("we hold that a habeas petition filed after the district court dismisses a previous petition

19   without prejudice for failure to exhaust state remedies cannot relate back to the original habeas

20   petition.")

21       But even assuming, *arguendo*, that petitioner had included exhausted claims in his

22   previous habeas petition, the court was not required to notify him about the stay and abeyance

23   procedure.  It was not until September 6, 2002, that the Ninth Circuit held that the district court

24   erred by failing to inform the prisoner "(1) that it could consider his stay motions only if he opted

25   to amend the petitions and dismiss the then-unexhausted claims, and (2) that his federal claims

26   would be time-barred, absent cause for equitable tolling, upon his return to federal court if he

27   opted to dismiss the petitions 'without prejudice' and return to state court to exhaust all of his

28   claims."  Ford v. Hubbard, 330 F.3d 1086, 1093 (9th Cir.  2002), vacated sub nom. Pliler v. Ford,

542 U.S. 225 (2004).  Petitioner's prior case was dismissed in 2000, before Ford issued in late

2002.  Subsequently, the Supreme Court disagreed with and vacated Ford, holding that the

advisements were not required.  Pliler, 542 U.S. at 231 ("district courts are not required to give

the particular advisements required by the Ninth Circuit before dismissing a pro se petitioner's

mixed habeas petition under Rose [v. Lundy, 455 U.S. 509].")

    For all of the above reasons, petitioner is not entitled to equitable tolling on the basis of

rulings issued in Case No. 2:00-cv-0431 GEB DAD.

    B.  Mental Illness

    The Ninth Circuit has articulated a specific, two-part test for an equitable tolling claim

based on a petitioner's mental impairment:

>    (1) *First,* a petitioner must show his mental impairment was an
>    "extraordinary circumstance" beyond his control by demonstrating
>    the impairment was so severe that either
>
>      (a) petitioner was unable to rationally or factually to personally
>    understand the need to timely file, or
>
>      (b) petitioner's mental state rendered him unable personally to
>    prepare a habeas petition and effectuate its filing.
>
>    (2) *Second,* the petitioner must show diligence in pursuing the
>    claims to the extent he could understand them, but that the mental
>    impairment made it impossible to meet the filing deadline under the
>    totality of the circumstances, including reasonably available access
>    to assistance.

Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (citations omitted) (italics in original);

see also Orthel v. Yates, 795 F.3d 935, 938 (9th Cir. 2015) ("A petitioner seeking equitable

tolling on the grounds of mental incompetence must show extraordinary circumstances, such as

an inability to rationally or factually personally understand the need to timely file, or a mental

state rendering an inability personally to prepare a habeas petition and effectuate its filing.").

    Bills provides guidance for applying its two-part test:

>    [T]o evaluate whether a petitioner is entitled to equitable tolling, the
>    district court must:  (1) find the petitioner has made a non-frivolous
>    showing that he had a severe mental impairment during the filing
>    period that would entitle him to an evidentiary hearing; (2)
>    determine, after considering the record, whether the petitioner
>    satisfied his burden that he was in fact mentally impaired; (3)
>    determine whether the petitioner's mental impairment made it

impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

<u>Bills</u>, 628 F.3d at 1100-01.  "This reiterates the stringency of the overall equitable tolling test:  the mental impairment must be so debilitating that it is the but-for cause of the delay, and even in cases of debilitating impairment the petitioner must still demonstrate diligence." <u>Yow Ming Yeh v. Martel</u>, 751 F.3d 1075, 1078 (9th Cir.), <u>cert. denied sub nom.</u> <u>Yow Ming Yeh v. Biter</u>, 135 S. Ct. 486 (2014), citing <u>Bills</u>, 628 F.3d at 1100.

A petitioner alleging a severe mental impairment during the filing period is not entitled to an evidentiary hearing unless he or she makes "a good faith allegation that would, if true, entitle him to equitable tolling." <u>Laws v. Lamarque</u>, 351 F.3d 919, 921 (9th Cir. 2003) (remanding for consideration of whether the petitioner's delayed filing was "attributable to psychiatric medication which deprived Petitioner of any kind of consciousness" where the petitioner had demonstrated "evidence of serious mental illness" by attaching prison psychiatric and medical records); <u>see</u> <u>Bills</u>, 628 F.3d at 1099-1100 (remanding where the petitioner was in the lowest percentile for verbal IQ, verbal comprehension and working memory, and, according to clinical psychologists, was incapable of inferential thinking necessary to complete a federal habeas form); <u>see also</u> <u>Orthel</u>, 795 F.3d at 939-40 ("Where the record is amply developed, and where it indicates that the petitioner's mental incompetence was not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's allegations of mental incompetence.") (quoting <u>Roberts v. Marshall</u>, 627 F.3d 768, 773 (9th Cir. 2010).)

i. Petitioner's Medical Records

The medical records provided reflect the following.  Petitioner arrived in CDCR custody in June of 1996, and was housed at DVI.  (ECF No. 22 at 48 (June 7, 1996); ECF No. 22 at 42 (June 21, 1996).)  On June 21, 1996, a "Brief Screening Report"[3] was prepared, stating that there were "indications that this offender is experiencing a major depression," and referral to a mental

---

[3]  The "Brief Screening Report" is typewritten without identifying its author.  Several of these reports were provided and, unless otherwise noted, each fails to identify the author.

1   health professional was indicated.  (ECF No. 22 at 45.)  On October 1, 1996, S. Ross, MTA, filed

2   a request for priority psychiatric/psychological services, noting petitioner had a history of

3   psychiatric care that needed re-assessment, medications were ordered, and requested that

4   petitioner be seen within 24 hours.  (ECF No. 22 at 49.)  On October 11, 1996, Dr. Kotila, Ph.D.,

5   staff psychologist, found petitioner was depressed and reported that the Doxepin[4] medication was

6   inadequate.  (ECF No. 22 at 50.)  Dr. Kotila referred petitioner to a psychiatrist for medications,

7   noting petitioner "seem[ed] rational, nonpsychotic."  (ECF No. 22 at 50.)

8        On October 18, 1996, petitioner was diagnosed with schizoaffective disorder, bipolar.

9   (ECF No. 22 at 44)  His GAF[5] score was 58, based on voices, depression, paranoia.  (ECF No. 22

10  at 44, 51.)  Dr. Salz assigned petitioner to the Clinical Case Management ("CCCMS") level of

11  care.  (ECF No. 22 at 51.)  On October 21, 1996, petitioner was prescribed Doxepin by Jamie

12  Norum, M.D.  (ECF No. 22 at 52.)

13       On October 24, 1996, Dr. Norum wrote that petitioner was seen by Dr. Welk on October

14  21, 1996, and given a prescription for Sinequan, 100 mg.  (ECF No. 22 at 50.)  Dr. Norum found

---

15
16  [4]  Doxepin (Sinequan) is an antidepressant, included on the list of heat risk medication "because of [its] potential to impair thermoregulation."  (ECF No. 22 at 132.)

17
18  [5]  "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Am. Psychiatric
19  Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR").  A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood
20  and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some
21  meaningful interpersonal relationships.  Id.  A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,
22  occupational, or school function (e.g., few friends, conflicts with peers or co-workers.)  Id.  A 41-
23  50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning.  A GAF of 31-40 indicates:  "Some
24  impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations,
25  judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)"
26  Id.  A GAF of 21-30 indicates:  "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes
27  incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in
28  almost all areas (e.g., stays in bed all day;  no job, home, or friends)."  Id.

petitioner stable with no complaints; principal diagnosis was amphetamine abuse and depressive disorder NOS [not otherwise specified] (in view of 29 year to life sentence); mental health placement: CCCMS by Dr. Salz, Ph.D., on October 18, 1996. (ECF No. 22 at 50.) Petitioner was scheduled to return to clinic on November 17, 1996, for follow up medication review. (ECF No. 22 at 50.)

On October 30, 1996, psychiatrist C. Martin saw petitioner and noted that petitioner was "still crying," and assessed that petitioner was polysubstance dependent in [illegible] with mood disorder. (ECF No. 22 at 54.) Dr. Martin prescribed Amitriptyline, a different antidepressant, also sold under the name Elavil. (ECF No. 22 at 53.)

On January 25, 1997, written on the same progress note page as the October 30, 1996 notes, a medical doctor (signature illegible), wrote that petitioner was not suicidal, his speech was coherent and logical, and assessed petitioner with depressive disorder, NOS, and prescribed him Elavil, 100 mg for 90 days. (ECF No. 22 at 54.)

On February 15, 1997, a "Brief Screening Report" was completed, noting that there were "indications that this offender has a possible mood disorder," was "experiencing a major depression," "is suffering from a mental illness," and should be referred to a mental health professional. (ECF No. 22 at 55.) On February 17, 1997, petitioner was seen by D. Salz, Ed.D, who referred petitioner for further evaluation. (ECF No. 22 at 58.)

On February 22, 1997, petitioner was still housed at DVI, and Dr. Norum found petitioner alert, nondepressed, and nonpsychotic, and he denied suicide attempts or suicidal ideation. (ECF No. 22 at 54.) A history of amphetamine dependence was noted. Dr. Norum discontinued the CCCMS level of care and the Elavil, prescribed Benadryl, 100 mg, and Vistaril, 25 mg, ordered petitioner returned to the general population, and a return to clinic in 90 days. (ECF No. 22 at 54.) On February 22, 1997, Dr. Norum also completed the form "Reception Center Psychiatric Medication Evaluation," noting his assessment, and checked the box "no medication was required." (ECF No. 22 at 59.) For behavior alerts, Dr. Norum wrote that petitioner: "Has 25 yr [to] life sentence -- Prefers Mule Creek SP, Level IV, if possible." (ECF No. 22 at 60.) On February 22, 1997, Dr. Norum also completed the "Mental Health Placement" form, marking

12

1   "does not meet criteria for inclusion in the [mental health] treatment population," GAF 85, and

2   "not on psychotropic medication." (ECF No. 21-10 at 2; 22 at 60.)  However, on February 22,

3   1997, Dr. Norum also completed a "Medical Necessity Review for CCCMS" form, checking the

4   box, "This inmate does MEET criteria for inclusion in the [mental health] treatment population --

5   CCCMS," and checking the box "NOT currently taking psychotropic meds." (ECF No. 22 at 61.)

6   On the CDC 128 C form referred to in the "Medical Necessity Review for CCCMS" form, Dr.

7   Norum checked the box "does not meet criteria for inclusion in the [mental health] treatment

8   population." (ECF No. 22 at 60.)   But petitioner's "Inmate Health Assessments" form reflects

9   that petitioner was in the CCCMS level of care on February 22, 1997, and didn't return to general

10   population until February 24, 1998. (ECF No. 21-9 at 4-5.)

11         At some point, petitioner was transferred to SVSP.  On March 5, 1997, MTA Kell

12   completed an "Informational Chrono Referral for Psychiatric/Psychological Services" form,

13   noting that petitioner's history of psychiatric care needed reassessment, and recommended

14   psychiatric medication review, writing "CCCMS Suicide attempt in '90 or '91." (ECF No. 22 at

15   62.)  At the bottom, a handwritten notation (in different handwriting), states:  "3/6/97 No meds -

16   Refer IDTT."[6] (ECF No. 22 at 62.)  On March 6, 1997, petitioner was seen by a medical doctor,

17   whose name is illegible, and who noted "No meds," and "Refer IDTT." (ECF No. 22 at 61.)  On

18   April 4, 1997, petitioner failed to show for an appointment. (ECF No. 22 at 61.)  On April 10,

19   1997, petitioner was not seen due to prison lockdown, with note to "Re-ducat in one week."

20   (ECF No. 22 at 61.)

21         On February 19, 1998, petitioner was reviewed in IDTT, and the committee determined

22   that he "does not meet the criteria for placement in the Mental Health Delivery System.  His

23   current placement is G.P. [general population].  He requires no mental health services." (ECF

24   No. 22 at 63.)  Petitioner's GAF was noted as 70, and his diagnosis was "V71.09."[7] (ECF No. 22

---

[6]  IDTT is a CDCR acronym for the Interdisciplinary Treatment Team.

[7]  The Diagnostic & Statistical Manual of Mental Disorders notes that V71.09 means "no Diagnosis or Condition on Axis I."  Id., Fourth Ed., § 21, American Psychiatric Association (2000).

1    at 63.)  On February 19, 1998, Michael Crooker, MBA, LCSW, at SVSP, completed a "Mental

2    Health Placement REMOVAL" chrono, removing petitioner from the MHSDS (Mental Health

3    Services Delivery System).  (ECF No. 22 at 64.)

4         Petitioner was transferred to PVSP, and on January 18, 2000, petitioner was seen by Sr.

5    Psychologist Hoffman, Ph.D., who noted that petitioner arrived from SVSP on December 29,

6    1999, and was referred for mental health evaluation due to his prior CCCMS inclusion.  (ECF No.

7    22 at 65.)  Petitioner stated:  "I was depressed."  (Id.)  Dr. Hoffman wrote:

8              Today, he presents [with] appearance WNL [within normal limits],
             ambulates slowly ("sore ankle"), and is in good spirits.  He denies
9            experiencing   psychiatric   difficulties   and   does   not   exhibit
             [symptoms] indicative of CCCMS mental disorder.  P:  Inmate
10           encouraged to contact [mental health] should he desire further
             services.
11

12   (ECF No. 22 at 65.)  He remained housed in general population.  (ECF No. 21-9 at 4.)

13        At some point, petitioner was transferred to CSP-Solano, but remained in the general

14   population.  (ECF No. 21-9 at 4.)  On September 25, 2003, O.S. Glover, Ph.D., psychologist,

15   excluded petitioner from the Developmental Disability Program, noting petitioner has good

16   cognitive skills; no further assessment needed.  (ECF No. 22 at 94.)

17        On October 20, 2005, a CSP-Solano mental health provider noted:

18             S:  "My depression is seasonal -- the holidays.  I'm a lifer and my
             family is out there.  My case is getting ready for an appeal.  I'm
19           stressed out."

20             O:  Alert and cooperative

21             A:  Frustration with case factor

22             P:  Remain general population

23   (ECF No. 22 at 95.)  From 2005 through June 4, 2007, petitioner remained housed in the general

24   population.  (ECF No. 21-9 at 3-4.)

25        On June 5, 2007, at CSP-Solano, petitioner was included in the MHSDS at the CCCMS

26   level of care, with a GAF of 65.  (ECF No. 21-2 at 25.)

27   ////

28   ////

On August 6, 2007, H. Taylor, Ph.D. at CSP-Solano, noted petitioner's placement in a MHCB (mental health crisis bed)[8] on August 5, 2007, and listed his GAF at 30.  (ECF No. 21-2 at 24.)  On August 7, 2007, R. Potts, LCSW at CSP-Solano, issued a chrono for petitioner's placement in a MHCB, and assessed his GAF at 30; petitioner was transferred to the Substance Abuse Treatment Facility ("SATF").  (ECF No. 21-2 at 24.)  That same day, August 7, 2007, LCSW Apodaca, noted petitioner's placement in the MHCB for suicidal ideation; GAF 29, with psychotropic medication prescribed.  (ECF No. 21-2 at 22.)

On August 13, 2007, LCSW Apodaca included petitioner in the CCCMS level of care, GAF 55, with psychotropic medication prescribed.  (ECF No. 21-2 at 21.)  On August 27, 2007, in the CCCMS outpatient treatment plan, petitioner's mood was depressed, and his sleep was poor, but he had no hallucinations or delusions.  (ECF No. 17 at 72.)  His cognition was within normal limits, his college education was noted, and GAF 62.  (ECF No. 17 at 72.)  Petitioner's problem was described as "depression and anxiety."  (ECF No. 17 at 74.)

On September 9, 2007, LCSW Apodaca noted petitioner's inclusion in the MHCB for suicidal ideation, GAF 29, with psychotropic medication prescribed.  (ECF No. 21-2 at 19.)

On October 1, 2007, R. Coffin, Psy.D., noted petitioner's inclusion in the EOP level of care, GAF 49, with psychotropic medication prescribed.  (ECF No. 21-2 at 18.)

On October 15, 2007, petitioner was housed in the general population at SATF at the EOP level of care, and was assessed for suicide risk to determine the need for referral to the Crisis (MHCB) program.  (ECF No. 21-1 at 34.)  Petitioner reported he was "Not feeling right," had suicidal ideation, was adjusting to yard issues, possible divorce from wife, and loss of contact with children (block phone).  L. Maravilla, MSW, referred petitioner to psychiatrist for medical review, and found petitioner at moderate risk.  (ECF No. 21-1 at 34.)  On October 15, 2007, petitioner was seen by Richard Berkson, M.D., Chief Psychiatrist, who wrote that petitioner was

---

[8]  "The MHCB level of care is also for inmates "awaiting transfer to a hospital program" and for inmates "being stabilized on medication prior to transfer" to a lower level of care.  Id.  Finally, DMH inpatient care is for inmates who "cannot be successfully treated" at a lower level of care; both intermediate and acute levels of inpatient care are to be provided."  Coleman v. Schwarzenegger, 922 F. Supp. 2d at 903 n.24.

15

1    "exaggerating symptoms to gain MHCB admission.  When told he would not be transferred to

2    MCSP (Mule Creek State Prison), he laughed and denied suicidality."  (ECF No. 21-1 at 35.)  Dr.

3    Berkson noted that petitioner was "motivated to transfer to SNY-EOP program," and "started"

4    him on Remeron (antidepressant) for insomnia/depression.  (ECF No. 21-1 at 35.)

5         On October 26, 2007, petitioner's medications were Paxil, Propranolol, Risperdal

6    (antipsychotic), Wellbutrin, and Remeron, petitioner was assessed a GAF of 50.  (ECF No. 17 at

7    127.)  Petitioner was not doing well; Dr. B. Penny, staff psychiatrist, increased Paxil,

8    discontinued Propranolol, tapered off the Wellbutrin, and continued the Risperdal and Remeron.

9    (ECF No. 17 at 127.)

10        On December 10, 2007, at SATF, C. Staley, Ph.D, saw petitioner, on EOP level of care,

11   for depression, being away from family.  (ECF No. 17 at 118.)  Present mental status exam were

12   all within normal limits, except he sleeps only 5 hours per night and has a poor appetite.  (ECF

13   No. 17 at 118.)  Petitioner appeared "stable at this time."  (Id.)  On December 13, 2007, petitioner

14   met with S. Minor, Ph.D., Clinical Psychologist at MCSP, and discussed petitioner's anxiety

15   regarding his movement from PVSP to Solano to Corcoran.  (ECF No. 17 at 113.)  He reported

16   first exhibiting serious depression at Corcoran and felt he was in danger due to reporting

17   confidential information; he provided the information because he wanted to be able to "give up"

18   his "shot caller" status and be with his family.  (ECF No. 17 at 113.)  Dr. Minor noted that

19   petitioner had verbal skills "higher than the prison population (which more than likely assisted in

20   his 'shot calling' status).  He appeared at times to be impression managing and dominated the

21   conversation much of the session."  (ECF No. 17 at 113.)  Dr. Minor assessed petitioner's GAF as

22   48, retaining petitioner on EOP "for further observation.  This therapist will keep a close eye on

23   his manipulative behaviors and possible victimization of other [inmates] on EOP."  (ECF No. 17

24   at 113.)

25        By December 18, 2007, petitioner was transferred to MCSP, and Dr. Minor included

26   petitioner in the EOP level of care, GAF 48, with psychotropic medication prescribed.  (ECF No.

27   21-2 at 17.)  On December 20, 2007, petitioner was upset about his IDTT; he felt he was being

28   punished for providing confidential information, which was then distributed to staff on the living

1   unit, and claimed that a staff member asked petitioner about "smuggling cell phones and what cell

2   phones were 'going for' in a prison setting."  (ECF No. 17 at 112.)  Petitioner was shocked that

3   staff, not at the IDTT, would have petitioner's confidential information.  (Id.)  Dr. Minor wrote:

4           Discuss the impact of his criminal behavior as 'shot caller' and
            other manipulations he had been involved in has impacted him at
5           MCSP.  [Petitioner] was able to hear the feedback, but defended his
            actions by stating that 'I want to drop all that' and 'that is why I am
6           here.'  He presented as a victim of his circumstance and preferred to
            exclude or minimize his responsibility in the years of previous
7           criminal and manipulative behavior.

8   (ECF No. 17 at 112.)  Dr. Minor assessed petitioner as stable, GAF 48, oriented times three, and

9   did not appear to be responding to internal stimuli or auditory hallucinations.  (ECF No. 17 at

10  112.)  On December 24, 2007, petitioner was noted as a new arrival, having been at MCSP for

11  two weeks.  (ECF No. 17 at 110.)

12          On January 3, 2008, Dr. Minor assessed petitioner as follows:  "appears narcissistic and

13  believes he has the ability to control others and 'know what they are thinking.'  He has very little

14  insight in to his process and is rigid in his over inflated sense of self-worth and efficacy.  GAF =

15  49."  (ECF No. 17 at 108.)  On February 8, 2008, Dr. Minor opined that petitioner's "need for

16  control and his intense desires to create predictable environment for himself are being

17  challenged," and that he had "very little insight into his dysfunctional thinking," and his "criminal

18  thinking and past predatory behavior for self-gain makes him a high risk on the EOP program for

19  victimizing lower functioning [inmates]."  (ECF No. 17 at 103.)  Dr. Minor found petitioner's

20  reports of depression and anxiety were "very vague and could potentially be manufactured in an

21  attempt to manipulate his continued placement on EOP," GAF 49.  (ECF No. 17 at 103.)

22          At the March 18, 2008 IDTT, the committee found that petitioner was responding to

23  treatment on the EOP program, his symptoms had improved, his depression and anxiety were

24  mild "and he appear[ed] to be functioning well in the institutional setting," with a GAF of 65.

25  (ECF No. 21-5 at 34.)  His therapist recommended to the committee that petitioner be placed on

26  the CCCMS program.  He was prescribed Effexor, Mirtazapine (aka Remeron), Risperdal, and

27  Trazadone.  Dr. Minor noted petitioner was medication compliant, but stated that "[c]aution

28  should be used with this individual due to his medication seeking behaviors and his limited

17

1   financial resources." (ECF No. 21-5 at 34.)

2          On May 8, 2008, at MCSP by LCSW Lebron, petitioner was CCCMS level of care, GAF

3   65, with psychotropic medication prescribed.  (ECF No. 21-2 at 17.)  On June 24, 2008, LCSW

4   Lebron identified the same diagnoses for petitioner, GAF 70.  (ECF No. 17 at 94.)

5          On November 6, 2008, LSCW Lebron noted that "petitioner was adjusting to the yard.

6   Had been in EOP due to adjustment difficulties and lack of trust in the system.  Appears to have a

7   tendency to become agitated and hyper when facing unfamiliar problems, speech becomes a little

8   more rapid and increased modulation."  (ECF No. 17 at 85.)  Petitioner was diagnosed with

9   adjustment disorder with anxiety and depression and antisocial personality disorder, and GAF 70.

10  (ECF No. 17 at 85.)

11         On May 7, 2009, LCSW Lebron included petitioner in the CCCMS level of care, GAF 70,

12  with psychotropic medication prescribed.  (ECF Nos. 21-2 at 17; 21-7 at 50.)

13         On February 4, 2010, petitioner was CCCMS; his weekly assessment noted his thought

14  processes were linear with normal associations.   (ECF No. 17-1 at 110.)  On or about February

15  11, 2010, petitioner was placed in ad seg for possession of cell phone, syringe, and pruno at

16  MCSP.  (ECF No. 17-1 at 104.)  Petitioner was very upset about the ICC action stating, "I don't

17  want to be away from my family."  (ECF No. 17-1 at 104.)  On March 25, 2010, at MCSP,

18  petitioner was issued a chrono for placement in the CCCMS level of care, GAF 65, with

19  psychotropic medication prescribed.  (ECF No. 21-1 at 15.)

20         On May 4, 2010, petitioner was transferred to the DMH VPP at Vacaville for "continued

21  acute care and evaluation." (ECF No. 21-2 at 14.)  On May 11, 2010, a suicide risk assessment

22  was done by M. Wahoma, R.N., at SCC, because of petitioner's confusion.  (ECF No. 21-1 at 28.)

23  Petitioner had been in a MHCB, and was at SCC on his way to SATF; he stated he was "very

24  angry," and "does not trust anybody," but denied any other problems."  (ECF No. 21-1 at 29.)

25  Petitioner was at the CCCMS level of care.  (ECF No. 21-1 at 28.)  On May 13, 2010, petitioner

26  was placed in a MHCB and assessed a GAF of 29.  (ECF No. 21-2 at 13.)  On June 28, 2010,

27  petitioner was referred to the DMH VPP, GAF 29.  (ECF No. 21-2 at 12.)

28  ////

On June 29 or 30, 2010, petitioner was admitted from SATF to the VPP Acute Psychiatric Program.  (ECF No. 22 at 73, 75, 90, 96.)  The Social History Evaluation form stated the reason for his admission:

> Per referral, to clarify diagnosis, stabilize mood, increase coping skills and evaluate medications.  IP [inpatient] reported a desire for "suicide by cop." On 5/6/2010 he presented with suicidal ideation with a knife he had fashioned himself.  Also reports of vague H/I [homicidal ideation], anger with A/H [auditory hallucinations].

(ECF No. 22 at 73.)  On admission, his mental status was cooperative and oriented as to person, time, and place, but his affect-mood was euphoric and his perceptions were marked as auditory hallucinations.  (ECF No. 22 at 73.)  His self-harm history was reported as history of overdose in 1993, provoked a high speed chase to crash his motorcycle in 1994, reported suicidal ideation and made a knife on May 6, 2010.  (ECF No. 22 at 73.)  His personal history noted that he holds a BA degree from CSUS in computer science, and was employed by the City of Lodi until he left to care for his ailing mother in Hawaii.  (ECF No. 22 at 73-74.)  After his mother died, petitioner lived off of his inheritance.  (ECF No. 22 at 74.)  He is married and reported having three children, 6, 16, and 19 years old.  (ECF No. 22 at 73.)  Petitioner's psychiatric history was:

> Per referral, IP [inpatient] began to experience mental health problems beginning in 1992 following the death of his mother.  Per referral, IP was psychiatrically hospitalized x 30 days after her death.  IP OD [overdosed] in 1993 as he was separated from his family while at PVSP and in 2007.  MHCB admission on the following dates:  8/6/07 (OHU), 8/7/07, 9/9/07, 5/12/10.  Notes indicate some distorted thinking about wanting to be a martyr by killing a CO or killing himself to bring attention to inmates being separated by distance from their families.

(ECF No. 22 at 74.)  The diagnostic impression was noted as Axis 1, mood disorder NOS, recurrent; Axis II, personality disorder, NOS, and Axis IV, estrangement from family, lifer.  (ECF No. 22 at 74.)

Petitioner was seen by A.Tandinco, M.D., staff psychiatrist; petitioner denied auditory hallucinations are present, but "claim[ed] that he hears voices of angels. 'Dark side and light side.'  He denie[d] any delusions elicited, although he fe[lt] that at times he was paranoid in the past."  (ECF No. 22 at 76.)  Petitioner's insight regarding illness and judgment were "fair."  (ECF No. 22 at 76.)  Dr. Tandinco diagnosed petitioner as follows:  Axis I, mood disorder NOS; Axis

II, personality disorder NOS; Axis IV, incarceration; and Axis V, current GAF 30.  (ECF No. 22 at 76.)  The treatment plan was to admit petitioner to Q1, provide routine lab workup, and "[r]estart this medication from sending institution and we will wait in regards to program."  (ECF No. 22 at 76.)

On July 6, 2010, at his rehabilitation therapy, petitioner's appearance was disheveled, his affect was hypomanic, his mood was euphoric, and he had auditory hallucinations, but he was cooperative and oriented to time, place, person and situation.  (ECF No. 22 at 81.)  Petitioner "reported feeling stressed about his sentence and being away from his family," but "currently feeling better due to a family visit he received over the 4th of July weekend."  (ECF No. 22 at 81.)  No SI/HI [suicidal or homicidal ideation] and no SIB [self-injurious behavior] observed."  (ECF No. 22 at 82.)  Petitioner reported his "stressors include being a lifer and being away from his family," and "feels addicted to his family and becomes suicidal when he cannot visit with them when placed in far-away prisons."  (ECF No. 22 at 82.)  The recommended treatment was "relaxation, community games, open art studio, current events, and reading materials x2 weekly."  (ECF No. 22 at 82.)  Petitioner was seen by various medical professionals on July 6, 13, 22, 26, and 30, 2010.  (ECF No. 22 at 84, 85.)

On July 10, 2010, S. Dahl, LCSW, completed a VPP Acute Psychiatric Program Social History Evaluation:

> Diagnostic Rationale:   IP [inpatient] with hx [history] of mental health issues beginning in 1992 at the age of 24 secondary to bereavement issues around his mother's death.   IP with bouts of depression and decompensation with SI [suicidal ideation] and SA [suicide attempts].   IP has expressed some distorted thinking about wanting to be a martyr and reportedly perseverates on the unfairness of his situation.   IP has not expressed delusional thoughts but has reported hearing his deceased sister's voice in the past.   His thoughts seem to be connected to an Axis II dx [diagnosis] with borderline and/or antisocial features.
>
> Recommendations:   IP will benefit from medication management. IP will participate in unit programming and advance in his issue.
>
> Plan at this time is to discharge to EOP level of care when IP has stabilized and attained maximum benefit from acute.

(ECF No. 22 at 66.)  Petitioner's current GAF was 30.  (Id.)

1        On July 28, 2010, petitioner was discharged to the EOP level of care.  (ECF No. 22 at 86.)

2  LCSW Dahl noted that petitioner had not displayed any suicidal symptoms since his admission;

3  progressed through the program; full programmer with yard; attended groups and interacted

4  appropriately; mood and affect were within normal limits; was pleasant and cooperative and

5  reportedly taking his medications.  (ECF No. 22 at 86.)  Petitioner's diagnosis on discharge was:

6  Axis I, bipolar disorder NOS, methamphetamine dependence in remission in controlled

7  environment; Axis II, deferred; Axis IV, incarceration, lifer, separation from family; and Axis V,

8  GAF 40.  (ECF No. 22 at 86.)  Dahl recommended continued mental health treatment at EOP

9  level of care.  (ECF No. 22 at 86.)

10        On July 26, 2010, Dr. Geringson dictated petitioner's discharge summary, noting

11  petitioner's history of suicidal attempts:  overdose in 1993, high speed chase in 1994, overdose in

12  2007, and most recently suicidal ideation and made a knife to kill in 2010.  (ECF No. 22 at 98.)

13  Petitioner's medications were adjusted after his admission, and petitioner responded well to the

14  treatment, had no behavior problems, no self-injurious behavior, no suicidal or homicidal

15  ideations.  (ECF No. 22 at 98.)  Dr. Geringson found petitioner's insight was diminished and his

16  judgment was fair; petitioner had improved to the degree he no longer required inpatient care.

17  (ECF No. 22 at 98.)  At discharge petitioner was prescribed Geodon, 80 mg (anti-psychotic), and

18  Venlafaxine ER 225 mg (antidepressant).  (ECF No. 22 at 98.)  On July 30, 2010, petitioner was

19  at the EOP level of care and assessed a GAF of 40.  (ECF No. 21-2 at 11.)

20        On August 2, 2010, a "Rehabilitation Therapy Discharge Summary" was completed by J.

21  Turner, "RT," who noted that petitioner's discharge status was "CCCMS."  (ECF No. 22 at 88.)

22  Petitioner, 41, was admitted from SATF "for treatment of SI/HI."  (ECF No. 22 at 88.)  Petitioner

23  "reported feeling stressed about his sentence and being far away from his family.  No current

24  SI/HI and no SIB observed."  (ECF No. 22 at 88.)  Petitioner fully programmed and met his

25  treatment goals.  (Id.)  Petitioner reported "I nut up" when away from family.  Staff reported that

26  petitioner "has been in possession of contraband after weekend family visits."  (Id.)  Turner wrote

27  that petitioner "would continue to benefit from daily therapeutic groups along with vocational

28  training to decrease future SI."  (ECF No. 22 at 88.)

On August 9, 2010, Dr. Geringson wrote "D/C to EOP." (ECF No. 22 at 89.) The patient admission/discharge data document reflected that petitioner was admitted to CMF Vacaville Hospital on June 29, 2010, and discharged on August 9, 2010. (ECF No. 22 at 90.) His discharge diagnosis was: Axis I, Bipolar Disorder, NOS; Amphetamine Dependence; Axis II, diagnosis deferred; and Axis V, GAF 40. (ECF No. 22 at 90, 98.) On August 10, 2010, his GAF was 29. (ECF No. 21-2 at 10.) On August 12, 2010, petitioner's GAF was 45 and he was in EOP. (ECF No. 21-2 at 9.)

On August 19, 2010, petitioner was at the EOP level of care at CSP-Corcoran, and was diagnosed with bipolar disorder NOS, mood disorder NOS, with a GAF of 49. (ECF No. 21-1 at 16.) Petitioner was prescribed Gedeon (antipsychotic) for depression, and Effexor and Bisteril. (Id.) Petitioner reported completion of two years of college, and last worked at car sales, although he mostly lived off inheritance money. (ECF No. 21-1 at 17.) His mental status exam was within normal limits, except that he only slept 3 to 4 hours at night, and sometimes heard voices depending on what was going on around him. (ECF no. 21-1 at 19.) After the assessment, A. Hernandez, MSW, diagnosed petitioner as rule out mood disorder NOS; amphetamine dependence; bipolar NOS; antisocial personality disorder (by history), with a GAF of 49, and found that petitioner met the criteria for inclusion at the EOP level of care for his mood disorder. (ECF No. 21-1 at 21.) On August 25, 2010, petitioner remained in EOP. (ECF No. 17-1 at 82.) On November 14, 2010, petitioner was issued a chrono for medication review, and it was noted he had been medication compliant. (ECF No. 21-2 at 8.)

On November 30, 2010, petitioner, at the EOP level of care at MCSP, was evaluated for suicide risk because of transfer planning. (ECF No. 21-1 at 12.) LCSW D. Laughlin estimated petitioner's chronic risk as high based on his multiple risk factors and suicide attempts; his acute risk was low due to protective factors and upcoming family visits. (Id.) The treatment plan was for petitioner to contact staff if he experienced suicidal ideation plan or intent. (Id.) LCSW Laughlin and R.A. Prentice, Ph.D., found that petitioner had a qualifying mental disorder, and should receive the EOP level of care, and assessed a GAF score of 49. (ECF No. 21-2 at 7.)

////

22

On January 2, 2011, petitioner received a chrono for refusing to comply with his medication on three consecutive days; his medications were identified as Vistaril, Depakote, and Abilify (antipsychotic).  (ECF No. 21-2 at 5.)  On January 10, 2011, petitioner received a chrono for missing 50% or more of his medication in a seven day period, with a note that he was refusing all p.m. medications because he "has concerns about weight gain."  (ECF No. 21-2 at 6.)  On January 13, 2011, petitioner received a chrono for refusing to comply with his p.m. meds (4) on three consecutive days.  (ECF No. 21-2 at 5.)

On March 4, 2011, petitioner, at the EOP level of care, was evaluated at MCSP for suicide risk because of "HQ request."  (ECF No. 21-1 at 8.)  Petitioner was

> expressing concern re graduation to 3CMS in one month.  States he does not want to die.  States he wants help.  Mood is anxious. Behavior is cooperative.  Verbal in expressing concerns.  No apparent psychosis.  No plan or intent re suicide.

(ECF No. 21-1 at 10.)  Petitioner expressed feeling better following contact with P. Wood, Ph.D.; petitioner took prescribed medications and gave Naproxen pills in cell to nursing staff as a precaution.  (ECF No. 21-1 at 10.)  The treatment plan was for petitioner to discuss his concerns regarding transfer to CCCMS with his program administrator on Monday.  (Id.)

On March 25, 2011, petitioner was assessed for suicide risk by Alice M. Lebron, LCSW, BCD ("Board Certified Diplomate in Clinical Social Work"), at MCSP, because "initial from ad-seg."  (ECF No. 21-1 at 30, 32.)  Petitioner reported his history of suicide attempts, but reported no such thoughts at present.  (ECF No. 21-1 at 32.)  Petitioner has concerns about proposed transfer that would take him away from visits with his wife and children.  (ECF No. 21-1 at 32.) The treatment plan was for petitioner to be seen for follow-up and to explore problem solving, emotional processing and personal belief system.  (ECF No. 21-1 at 32.)  On March 29, 2011, petitioner was at the CCCMS level of care, GAF 61; on April 14, 2011, he remained in CCCMS with a GAF of 65.  (ECF No. 21-2 at 3, 4.)

On May 13, 2011, at CTF, W. Reese, Ph.D., performed a suicide risk assessment. (ECF No. 21-1 at 6.)  Petitioner's prior suicide attempts were listed:  1994 high speed car chase, danger to self; 2007, overdose in prison when convicted; May, 2010, plan to overdose pills and

1   rush correctional officer for death by cop; hanging noose, crisis bed.  (ECF No. 21-1 at 6.)

2   Petitioner did not report a desire to die or a plan to kill himself.  (ECF No. 21-1 at 6.)  Dr. Reese

3   included additional details:

4
5   > Upset, angry, claims EOP symptoms of severe mental disorder of
    > bipolar type.

6   > He is asking for help and EOP counseling.  The medical and mental
    > health record does not support the jump from EOP status in 12,
7   > 2010, to "Miracle Cure Medical Necessity" in 4/11 when
    > [petitioner] claims that he is seriously mentally ill, and has a severe
8   > record of suicide attempts, and so designated by the California
    > Medical Facility at Vacaville.

9   (ECF No. 21-1 at 7.)  Dr. Reese found that petitioner "must be considered a moderate risk for

10  both chronic and acute estimations of risks" based on his extensive history of four past lethal

11  suicide attempts, and faults in reasoning.  (ECF No. 21-1 at 7.)  The treatment plan included an

12  IDTT in CTF North on May 17, 2011, and recommended weekly therapy and transfer to EOP

13  program, "adjunctive psy regimen," and evaluation for major mental illness bipolar disorder."

14  (ECF No. 21-1 at 7.)  Dr. Reese noted:

15  > On 12.14.2010, [petitioner] had GAF of 49 and MAJOR MENTAL
    > ILLNESS OF BiPolar Disorder.   Then in 4.14.2011, allegedly
16  > cured with MEDICAL NECESSITY DIAGNOSIS 296.9 and NO
    > MAJOR MENTAL ILLNESS, yet STILL RECEIVED MAJOR
17  > MENTAL ILLNESS PSYCH MEDS (i.e. Arilpiprazole/ABILIFY)

18  (ECF No. 21-1 at 7.)  Dr. Reese included a safety plan of "weekly visits as EOP Services, and

19  briefed to notify [correctional officer] and mental health, re:  any emergent situation."  (Id.)

20      On May 14, 2011, petitioner was issued a chrono for refusing his medication on three

21  consecutive days.  (ECF No. 21-2 at 2.)  On May 17, 2011, Dr. Reese, issued a chrono continuing

22  petitioner on the EOP level of care, and listed his GAF at 48.  (ECF No. 21-2 at 2.)

23      On May 24, 2011, petitioner signed a "Statewide Psychotropic Medication Consent form"

24  stating that he was made aware that he was on a heat risk medication by Dr. Bhatti, M.D., and

25  "Risperdal 6 wk" is handwritten on the form.  (ECF No. 22 at 130.)  The box marked "atypical

26  antipsychotics" was marked, stating that

27  > antipsychotic medications are used to treat symptoms of psychosis
    > that may include hearing voices, seeing things, or sensing things
28  > that are not there, mistaken beliefs or unusual suspiciousness.  They

> are also used to help with disorganized or confused thinking, anxiety, agitation or feelings of violence or losing control. It is also used to treat mixed or manic episodes in adults who have a condition called Bipolar disorder. Bipolar disorder is a mental illness that causes extreme mood swings.

(ECF No. 22 at 131.)

On August 16, 2011, at CTF, Dr. Reese signed a chrono stating that petitioner had a qualifying mental disorder, assigned to the EOP level of care, GAF 49, and psychotropic medication prescribed. (ECF Nos. 17-1 at 129; 22 at 100.)

On September 27, 2011, LCSW West at MCSP signed a chrono that petitioner's qualifying mental disorder required the EOP level of care, his GAF was 42, and psychotropic medication prescribed. (ECF Nos. 21-1 at 61; 22 at 101.)

On November 3, 2011, petitioner had a 1:1 appointment with J. Wilcox, Ph.D., Psy.D. (ECF No. 21-3 at 79.) Petitioner reported he had been trained as a machinist and certified welder. (Id.) Over the last 6 months, petitioner had lost 50 pounds on a running, work-out and power yoga program. (Id.) Petitioner's mood was anxious, his organization rambling, his insight and judgment were fair to good, and his strengths were assessed as self-aware, courageous, bright, with realistic goals, and his GAF was 45. (Id.) His medications were listed as Effexor, Lithium and Trileptal. On November 4, 2011, a "Nursing Assessment and Data Base" form was completed, noting that petitioner was taking Trileptal and Effexor. (ECF No. 21-1 at 3.)

On December 27, 2011, petitioner's treatment team members issued a mental health treatment plan finding that petitioner "requires ongoing EOP services to maintain current gains in symptom stability and symptom remission." (ECF No. 22 at 102.) His problems were noted as mood instability, impulse control, hypomania/mania, and anxiety, for which he attended 7-11 groups per week for individual and group psychotherapy. (ECF No. 22 at 102.) Petitioner was taking the following psychotropic medications: Trileptal for mood instability, and Effexor for depression. (ECF No. 22 at 102.) His risk factors for suicide were recorded: first suicide attempt in 2009; most recent, April 2011 overdose/hanging; suicide attempts occurred when he was transferred to prisons away from family. (ECF No. 22 at 102.) His mental status exam was

25

1   within normal limits except that his affect was blunted, his mood was anxious and could become

2   manic/hypomanic, his memory was recorded as "poor historian doesn't remember dates well," his

3   auditory hallucinations and delusions of persecution currently under good control, obsessions

4   were noted as "family problems; not being a good father," and his insight and judgment were

5   listed as "fair."  (ECF No. 22 at 103.)  His current diagnosis was Bipolar disorder, NOS, and

6   amphetamine dependence, in institutional remission, and anti-social personality disorder; GAF

7   49.  (ECF No. 22 at 104.)

8        On June 22, 2012, petitioner received a 128-C chrono for refusing all a.m. meds.  (ECF

9   No. 21-1 at 60.)  On June 27, 2012, petitioner received a 128-C chrono for refusing nurse

10   administered medications for three consecutive days.  (ECF No. 21-1 at 59.)  On both 128-C

11   chronos, the psych box was checked and "Kecskes" was identified as the prescribing provider.

12   (Id.)

13        On July 18, 2012, petitioner completed a Health Care Services Request Form asking to

14   see "Dr. K" to "get put back on some kind of medication."  (ECF No. 21-2 at 43.)  On July 19,

15   2012, petitioner was working as building 6 porter.  (ECF No. 21-3 at 32.)  Dr. Wilcox noted that

16   petitioner just had another Mohawk haircut, is known by the nickname, "the Rock," "and

17   continues to act in ways to draw negative attention to himself and to intimidate (or attempt to)

18   intimidate other inmates."  (ECF no. 21-3 at 32.)  His GAF was 46.  (Id.)

19        On July 24, 2012, currently in the EOP program at MCSP, petitioner asked to be returned

20   to psychotropic medications; he had been off all such medication since his last contact visit.

21   (ECF No. 21-3 at 30.)  Petitioner refused certain medications, but Dr. Kecskes prescribed

22   petitioner Lamictal 25 mg.  (ECF No. 21-3 at 30-31.)  On August 28, 2012, J. Wilcox, Ph.D. at

23   MCSP, found petitioner suffered from a qualifying mental disorder requiring the CCCMS level of

24   care, GAF 51, and was prescribed psychotropic medications.  (ECF No. 22 at 105.)

25        On September 7, 2012, Michael Smith, M.D., Staff Psychiatrist at MCSP, performed a

26   routine initial psychiatric evaluation on petitioner who was moved from EOP to the CCCMS level

27   of care.  (ECF No. 21-3 at 20.)  Petitioner reported he had started college classes, and was

28   previously a porter in the EOP building.  (Id.)  Petitioner's thought process was linear, and his

1   insight and judgment were fair, and he was prescribed 100 mg each of Vistaril and Lamictal.

2   (ECF No. 21-3 at 21.)  Dr. Smith assessed petitioner as a 43 year old, in prison for life, "trying to

3   maintain family connection with lots of unrealistic expectations and assumptions."  (ECF No. 21-

4   3 at 22.)  Dr. Smith noted petitioner's history of bipolar disorder diagnosis, but stated "look[ed]

5   more borderline than bipolar" to Dr. Smith "in light of significant cognitive distortions and

6   absence of current mood symptoms."  (ECF No. 21-3 at 22.)  Dr. Smith provided an Axis II

7   diagnosis of Borderline Personality Disorder and Antisocial Personality Disorder, with a GAF of

8   60.  (Id.)  Dr. Smith's plan was that petitioner may benefit from DBT ["Dialectitcal Behavior

9   Therapy"] class; continue medications, further diagnostic clarification as time permits -- better

10  fatherhood role for young son may be hook to get inmate engaged."  (ECF No. 21-3 at 22.)

11      On September 25, 2012, petitioner was again included in the CCCMS level of care, with a

12  GAF of 60, and was prescribed psychotropic medication.  (ECF No. 22 at 106.)  On November

13  27, 2012, S. Rossi, Psy. D. at Valley State Prison ("VSP"), found that petitioner met the inclusion

14  criteria the CCCMS level of care, GAF 60, and was prescribed psychotropic medication.  (ECF

15  No. 22 at 107.)

16      On November 27, 2012, petitioner's treatment team at VSP issued a mental health

17  treatment plan.  The clinical summary stated that

18      44 year old male presents with symptoms of mood instability
        described as being "short fused."  He also experienced periods of
19      depressed mood with a sense of hopelessness.  He also has been in
        and out of EOP since 2008 -- recently out 9/25.  Been on current
20      meds for past several months - have been helpful.  Indicates interest
        in groups focused on self-esteem and coping skills.  Has positive
21      family support which helps keep him stable.

22  (ECF No. 22 at 108.)  Petitioner was again diagnosed as Bipolar disorder, NOS, with a GAF of

23  60.  (ECF No. 22 at 108.)  His mental status exam was within normal limits, except that his affect

24  was noted as "expansive," and his mood listed as "at present, positive, lable" (ECF No. 22 at

25  109.)  His speech, marked within normal limits, was noted as "articulate."  (Id.)  His strengths

26  were listed as articulate and motivated to change.  (ECF No. 22 at 111.)  The plan noted his

27  transfer/discharge to CCCMS level of care.  (ECF No. 22 at 111.)

28  ////

1      On January 14, 2013, Bryan Harrelson, M.D., performed a psychiatric medication

2  evaluation due to medicine noncompliance.  (ECF No. 21-3 at 4.)  Petitioner disputed the

3  noncompliance, stating he had only missed an occasional weekend dose.  Petitioner's affect

4  remained broad, his mood was stable, there was no evidence of mania or psychosis, his thought

5  processes were linear, and his insight and judgment were adequate; GAF 62.  The treatment plan

6  was to continue Lamictal 100 mg in the morning and Vistaril 100 mg in the evening for mood

7  stabilization.  (ECF No. 21-3 at 4.)  On January 18, 2013, petitioner was seen by his primary

8  clinician, S. Snow, Psy.D, for regular two-month contact.  (ECF Nos. 21-2 at 79; 21-3 at 2-3.)

9  Petitioner's affect was broad, his mood was slightly dysthymic, but stable, his affect congruent

10  with mood, there was no evidence of mania or psychosis, thought process linear, and thought

11  content was within normal limits; GAF 62.  Dr. Snow's plan was to continue case management in

12  four weeks; refer petitioner to life group therapy and provide cognitive restructuring, lifelong

13  learning of values, and discovering of new self-image.  (ECF No. 21-2 at 79.)  On January 28,

14  2013, petitioner was listed at the CCCMS level of care, with no acute distress; relatively stable.

15  (ECF No. 21-2 at 78.)

16      On February 14, 2013, petitioner was seen by A. White, Ph.D., staff psychologist at VSP,

17  for follow-up.  (ECF No. 21-2 at 77.)  Petitioner was agitated about seeing several clinicians in a

18  short period of time rather than his primary clinician.  Dr. White quoted petitioner:  "I'm not

19  suicidal, I'm not homicidal, I know how to ask for help.  Please see me every 90 days.  This

20  affects my job.  I work in plants ops as the machinist."  (ECF No. 21-2 at 77.)  Petitioner has been

21  in the CCCMS program since 1994 except for 4-5 years as an EOP participant at MCSP.  His

22  thought contact was normal and thought process was intact, he was oriented in all spheres, and

23  had good eye contact; GAF 60.  Petitioner denied having hallucinations.  (ECF No. 21-2 at 77.)

24      On March 11, 2013, Dr. Harrelson performed a psychiatric medication evaluation.  (ECF

25  No. 21-2 at 74.)  Petitioner reported good compliance and no side effects with Lamictal and

26  Vistaril, but had some mood lability, especially regarding the depressed phase.  (Id.)  Dr.

27  Harrelson recommended increasing Lamictal to 150 mg daily.  (Id.)  Petitioner reported that he

28  works as a maintenance mechanic job in plant operations which he likes.  (Id.)  Dr. Harrelson

1   noted that petitioner's affect was somewhat constricted, there was no evidence of mania or

2   psychosis, his thought processes were linear, and his insight and judgment seemed adequate; GAF

3   60.  The treatment plan was to continue Vistaril 100 mg at bedtime as needed for anxiety, and to

4   increase Lamictal to 150 mg in the morning to reduce mood symptoms.  (ECF No. 21-2 at 74.)

5          On May 29, 2013, petitioner was referred to Dr. Harrelson for medicine noncompliance.

6   (ECF No. 21-2 at 71.)  Petitioner admitted to discontinuing Lamictal and Vistaril about 5 days

7   ago, because he wanted to come off mental health medicine, hoping to gain a transfer to be an

8   inmate worker at the new Stockton facility.  (ECF No. 21-2 at 71.)  Dr. Harrelson noted that

9   petitioner's affect was fairly broad, there was no evidence of mania or psychosis, his thought

10  processes were linear, and his insight and judgment were adequate; GAF 63.  The plan was to

11  discontinue Lamictal and Vistaril at petitioner's request, with follow-up in 30 days or sooner, if

12  needed.  (ECF No. 21-2 at 52.)

13         On June 26, 2013, petitioner completed a Health Care Services Request Form stating he'd

14  like to speak with the psychiatrist to "get back on [his] meds."  (ECF No. 21-2 at 39.)

15         On October 9, 2013, Dr. Harrelson performed a psychiatric medication evaluation.  (ECF

16  No. 21-2 at 67.)  Petitioner reported he was back on B-yard after having been on C-yard for a

17  little while.  (Id.)  Dr. Harrelson noted that petitioner's affect was fairly bright, his mood seemed

18  stable, there was no evidence of mania or psychosis, his thought processes were linear, and his

19  insight and judgment seemed adequate.  (ECF No. 21-2 at 67.)  The treatment plan was to

20  continue Lamictal 150 mg in the morning for mood swings, and Vistaril 100 mg at bedtime as

21  needed for anxiety.  (Id.)  Petitioner was assessed a GAF of 63.  (Id.)

22         On December 17, 2013, petitioner was issued a chrono at VSP noting he was CCCMS and

23  prescribed psychotropic medication.  (ECF Nos. 21-1 at 54; 22 at 112.)  The mental health

24  treatment plan was Vistaril 100 PRN for anxiety, and Lamictal 150 for mood swings.  (ECF No.

25  22 at 113.)  The clinical summary stated that petitioner has been in CCCMS off and on since

26  1996.  He was EOP off and on since 2008.  (ECF No. 22 at 113.)  He was again diagnosed as

27  Axis I, bipolar disorder, NOS; amphetamine dependence; Axis II, antisocial personality disorder;

28  Axis IV incarceration; and Axis V, GAF 60.  (ECF No. 22 at 113.)  His mental status exam was

1   within normal limits; it was noted in cognition that petitioner stated he has a Bachelor of Science

2   degree in computer science and was taking sociology and psychology courses at MCSP.  (ECF

3   No. 22 at 114.)  Petitioner described his current problem as:

4           "I'm not happy with me". . . he doesn't like what's done to his
         family and doesn't feel worthy.   At times he isolates, gets
5        combative, "short fused," easily frustrated and tends to blame
         others.  He goes through these depressive moods 'every month and
6        a half to two months and last about a week."

7   (ECF No. 22 at 115.)

8           On January 7, 2014, Dr. Harrelson performed a psychiatric medication evaluation.  (ECF

9   No. 21-2 at 64.)  Petitioner reported "good mood stabilization with medication, as well as reduced

10  anxiety."  (Id.)  Dr. Harrelson found petitioner's affect was broad, his mood stable, there was no

11  evidence of mania or psychosis, his thought processes were linear, and his insight and judgment

12  seemed good; GAF 64.  (ECF No. 21-2 at 64.)  The treatment plan was to continue Lamictal 150

13  mg daily for mood stabilization and Vistaril 100 mg at bedtime as needed for anxiety.  (Id.)

14          On February 4, 2014, petitioner was referred to Dr. Harrelson because of noncompliance.

15  (ECF No. 21-2 at 61.)  Petitioner reported missing some doses of Lamictal due to issues with the

16  morning medication line.  Petitioner's affect was broad, there was no evidence of mania or

17  psychosis, his thought processes were linear, and his insight and judgment remained good; GAF

18  64.  (ECF No. 21-2 at 61.)  The plan was to continue Lamictal 100 mg daily for mood

19  stabilization and Vistaril 100 mg at bedtime as needed for anxiety.  (Id.)  On April 21, 2014, Dr.

20  Harrelson performed a psychiatric medication evaluation.  (ECF No. 21-2 at 58.)  Petitioner

21  reported he continues to work a mechanic job which he likes."  (Id.)  Petitioner's affect was

22  pleasant and broad, there was no evidence of mania or psychosis, his thought processes were

23  linear, and his insight and judgment remained good; GAF 65.  (ECF No. 21-2 at 58.)  The plan

24  was to continue Lamictal 150 mg daily for mood stabilization and Vistaril 100 mg at bedtime as

25  needed for anxiety.  (Id.)

26          On July 24, 2014, Dr. Harrelson noted that petitioner's affect remained broad, there was

27  no evidence of mania or psychosis, his thought processes were linear, and his insight and

28  judgment were adequate; GAF 65.  (ECF No. 21-2 at 52.)  Petitioner reported he continues to

1    work a mechanic job which he likes." (Id.)  The treatment plan was to continue Lamictal 150 mg

2    daily for mood stabilization and Vistaril 100 mg at bedtime as needed for anxiety.  (Id.)  On

3    October 13, 2014, Dr. Harrelson noted that petitioner's mood was stable, there was no evidence

4    of mania or psychosis, and his thought processes were linear.  (ECF No. 21-2 at 52.)  Petitioner

5    was assessed a GAF of 65.  (Id.)

6         On November 6, 2014, and November 12, 2014, petitioner received chronos stating that

7    he had a qualifying mental disorder, was at the CCCMS level of care, GAF 60, and was

8    prescribed psychotropic medication.  (ECF Nos. 21-1 at 53; 22 at 117, 118.)  On November 12,

9    2014, petitioner's mental health treatment plan reflected the same medications, and diagnoses,

10   and his mental status exam was again within normal limits.  (ECF No. 22 at 120.)  Petitioner

11   claimed that the Lamictal helped, stating the "highs and lows aren't as low."  (ECF No. 22 at

12   121.)  He remained at the CCCMS level of care.  (ECF Nos. 21-1 at 51, 52; 22 at 122.)

13        On December 29, 2014, Dr. Harrelson noted that petitioner's mood was stable, there was

14   no evidence of mania or psychosis, and his thought processes were goal directed; GAF 67.  (ECF

15   No. 21-2 at 49.)  The treatment plan was to continue Lamictal 150 mg daily for mood

16   stabilization and Vistaril 100 mg at bedtime as needed for anxiety.  (Id.)

17        On March 23, 2015, Dr. Harrelson noted that petitioner's mood was stable, there was no

18   evidence of mania or psychosis, and his thought processes were linear; GAF 67.  (ECF No. 21-2

19   at 46.)  The treatment plan was to continue Lamictal 150 mg daily for mood stabilization and

20   Vistaril 100 mg at bedtime as needed for anxiety.  (Id.)[9]

21                    ii.  Discussion

22        After carefully considering the record, for the reasons stated herein, the undersigned finds

23   that petitioner is not entitled to equitable tolling based on mental illness.  Petitioner has not

24   demonstrated that he suffered from a severe mental impairment throughout the limitations period

25   that rendered him unable to rationally or factually understand the need to timely file his federal

26   petition or that rendered him unable to prepare his federal petition.

27

28   [9]  The next record, November 11, 2015, was after the June 16, 2015 relevant time frame.

31

a. <u>Severe Mental Impairment</u>

The mental health records reflect that when he arrived in CDCR custody in June of 1996, petitioner initially suffered from major depression.  On October 18, 1996, he was diagnosed with schizoaffective disorder, bipolar, and was prescribed Doxepin, an antidepressant.  On January 25, 1997, petitioner was prescribed Elavil, another antidepressant, which was discontinued on February 22, 1997, and he was prescribed antihistamines (Benadryl and Vistaril).  By then, petitioner's GAF was 85, and he was not prescribed psychotropic medication.  He remained in the CCCMS level of care until February 24, 1998, when he was released from the MHSDS program and returned to the general population.  It was not until June of 2007, that petitioner was returned to the CCCMS level of care.

Here, the relevant time period is between April 8, 1997, when the one-year limitations period began, and June 16, 2015, the date the instant petition was constructively filed.  <u>See</u> <u>Laws</u>, 351 F.3d at 923 ("Laws was adjudicated competent to stand trial in 1993, notwithstanding evidence of serious mental illness.  But that determination has little bearing on his competence *vel non* during the period, 1996-2000[,]" . . . "the years when his petitions should have been filed.")  However, in a case factually similar to this one, the Ninth Circuit focused on the one year during which the limitations ran.  <u>Orthel v. Yates</u>, 795 F.3d 935 (9th Cir. 2015).  Thus, the undersigned initially focuses on the one year period when the statute of limitations ran for this petitioner, from April 8, 1997, to April 8, 1998, during which he was housed at SVSP.

Importantly, on February 22, 1997, and February 19, 1998, petitioner was found not to meet the criteria for inclusion in the mental health treatment population, and was removed from mental health treatment.  (ECF No. 22 at 54, 63.)  Such removal coincides with petitioner's housing in the general population (ECF No. 21-9 at 3-4), and would explain the absence of any mental health records from 1997 to 1998.  Moreover, on February 19, 1998, petitioner's GAF was listed as 70.  (ECF No. 22 at 63.)  Although petitioner contends there are missing mental health records from March 6, 1997, to February 19, 1998, his placement in the general population does not suggest a severe mental impairment, and his GAF assessments of 85 and 70 reflect only mild symptoms.  In light of the evidence that petitioner was housed in the general population during

1  this period, his statement that while he was housed at SVSP from 1997 until 1999 "there was no

2  mental health services, or it was so inadequate that it seemed non-existent" (ECF No. 22 at 34), is

3  insufficient to show he was severely impaired from 1997 to 1999.  Indeed, even after he was

4  transferred from SVSP, he "denied experiencing psychiatric difficulties" on January 18, 2000.

5  (ECF No. 22 at 65.)  On October 20, 2005, at CSP-Solano, petitioner reported that his depression

6  was "seasonal," related to "the holidays."  (ECF No. 22 at 95.)

7        Thus, during the one year period when the statute of limitations period was running, from

8  April 8, 1997, to April 8, 1998, there is no evidence that petitioner was suffering from a severe

9  mental illness that impaired his ability to file a federal habeas petition while he was housed in the

10  general population at SVSP.  Moreover, the records reflect that petitioner was not returned to the

11  CCCMS level of care until early June of 2007, years after the limitations period expired, at which

12  time his GAF was listed as 65.  (ECF Nos. 21-2 at 25; 21-9 at 3.)

13        Petitioner's mental health appears to have deteriorated in August of 2007, when he was

14  transferred to a MHCB, and was not returned to CCCMS until March 18, 2008, and then suffered

15  another crisis on May 13, 2010, when he was transferred to a MHCB (ECF No. 21-2 at 13), then

16  admitted to the DMH VPP on June 29, 2010, and then released to another MHCB until he was

17  released to EOP on August 9, 2010 (ECF No. 22 at 89).  However, with the exception of these

18  crisis periods, petitioner was usually stable on medication.  After June 14, 2007, medical records

19  show that petitioner was frequently seen by mental health professionals, and was consistently

20  described by clinicians as alert and oriented, and his thought process organized.  Petitioner did not

21  complain of ill side effects from his medications, other than when he presented with a request to

22  change medications.  For example, on January 10, 2011, he refused his afternoon medications

23  because he believed they were causing him to gain weight.  (ECF No. 21-2 at 6.)  On a few

24  occasions, he complained regarding his sleep (ECF No. 17 at 72 ("poor" sleep); 17 at 118 (only 5

25  hours sleep per night).  While petitioner received changed and increased doses of medication, it

26  appears that petitioner was still able to function, since at these same appointments petitioner was

27  described as alert and oriented with an organized thought process.  His cognitive function was

28  consistently described as within normal limits.  Thus, although petitioner was taking psychotropic

medications during some of the relevant period, it does not appear that the medications left petitioner incoherent or unable to function.  Clearly, there were times when petitioner was in a crisis state, admitted to a crisis bed or the DMH following suicide attempts or when experiencing suicidal ideation.  But notably all such episodes occurred long after the limitations period had expired (August 6, 2007, September 11, 2007, June 3, 2010, June 28, 2010, and August 12, 2010).

In his opposition, petitioner provides a list of symptoms associated with psychotropic medications.  (ECF No. 22 at 130.)  He also sets forth the various psychotropic drugs he was prescribed and claims the provided list describes "some" of the side effects of taking psychotropic medications.  (ECF No. 22 at 10-11.)  However, petitioner does not specifically identify which side effects he suffered, or how such side effect impaired his ability to file his federal petition. Petitioner provided a declaration by his jailhouse lawyer, Stephen Snow, who shared his experiences with psychotropic medications and living with depression.  (ECF No. 22 at 174-75.) But such declaration fails to explain how petitioner's side effects or symptoms impaired his ability to file a timely federal petition.

Further, petitioner declares that it was "only in 2015, did [he] understand the need to prepare a habeas petition to file in a timely manner, by reading some type of manual showing how to prepare a habeas petition to file in a timely manner," and only after meeting Stephen Snow in December 2015, did [petitioner] understand the need to adequately prepare my legal papers to file in the federal court." (ECF No. 22 at 36.)  However, petitioner's medical records indicate that during the limitations period he was generally doing well, with rare complaints concerning the effects of the medication.  Other than those instances when petitioner was in a crisis state, petitioner denied having auditory hallucinations, or stated they were under control. Except for the crisis periods, petitioner's thought process was consistently described as linear, and his cognition within normal limits.  In addition, the record reflects that petitioner filed a pro se federal petition on February 29, 2000, as well as his own pro se habeas petitions in state court in 2014.

////

1     The court also notes that during the relevant time period, after he was transferred from the

2  general population to the CCCMS level of care on June 14, 2007, petitioner was routinely seen on

3  an outpatient basis and was frequently assigned to the CCCMS level of care, which "suggests that

4  petitioner was able to function despite his mental health problems." Washington v. McDonald,

5  2010 WL 1999469, at *2 (C.D. Cal. Feb. 19, 2010) (citing Coleman v. Schwarzenegger, 922 F.

6  Supp. 2d 882, 903 n.24 (E.D. Cal. 2009) (inmates designated to the CCCMS level of care "are

7  those 'whose symptoms are under control or in partial remission and can function in the general

8  prison population, administrative segregation, or segregated housing unit'"). Petitioner's GAF

9  scores were often listed in the 61-70 range (mild symptoms),[10] but returned to the 51-60 GAF

10  range, reflecting moderate symptoms, from August 28, 2011, through the end of the relevant

11  period in 2015.[11] On the other hand, during periods of crisis, petitioner's GAF scores dipped as

12  low as 29 and 30, and there were periods when his GAF assessments were in the 41-50 range.[12]

13     Despite such fluctuations in petitioner's GAF assessments, the medical records do not

14  demonstrate a medical incapacity so severe that it prevented petitioner from understanding and

15  acting on his rights. Rather, petitioner was generally oriented, able to communicate, and able to

16  understand others. In Roberts v. Marshall, 627 F.3d 768, 770 (9th Cir. 2010), equitable tolling

17  was not warranted because the petitioner's mental health records showed that he was medicated

18  for severe psychotic depression disorder, but he had normal mental functions, his appearance,

19  behavior, speech, and affect were within normal limits, he was not delusional, and had normal

20  insight and judgment. In Orthel, 795 F.3d at 941, the Ninth Circuit affirmed the dismissal of the

---

[10] Petitioner's GAF assessments were 65 (June 5, 2007, Mar. 18, 2008, and May 8, 2008), 70 (May 7, 2009), 65 (Mar. 25, 2010), 61 (Mar. 29, 2011), and 65 (Apr. 14, 2011).

[11] His GAF scores were 51 (Aug. 28, 2012), 60 (Sept. 7 &25, Nov. 27, 2012); 63 (Oct. 29, 2013); 60 (Dec. 17, 2013); 64 (Jan. 7 & Feb. 4, 2014); 65 (Apr. 21, 2014; July 24, 2015; Oct. 13, 2014); and 67 (Dec. 24, 2014, Mar. 23, 2015).

[12] His GAF assessments were 48-50 (Oct. 1, 2007 to Feb. 8, 2008), 40 (July 28, 2010), 45 (August 12, 2010), 49 (November 30, 2010), 48 (May 17, 2011); 49 (Aug. 16, 2011); 42 (Sept. 27, 2011); 49 (Dec. 27, 2011); and 46 (July 18, 2012). His GAF score was back to 55 on August 13, 2007.

1   petition where substantial evidence showed that -- despite fluctuations in mental health -- Orthel

2   possessed sufficient competence and capability in the year following the date on which the state

3   court judgment became final as well as sufficient competence during much of the eleven-year

4   span between finality of judgment and filing of his federal petition.  As argued by respondent,

5   petitioner's situation is much like Orthel's.  Despite his initial depression following his

6   sentencing on May 31, 1996, petitioner was treated at the CCCMS level and his GAF's were 58

7   on October 18, 1996, and 85 on February 22, 1997.  Like Orthel, petitioner was competent and

8   capable during the period the limitations period ran, as well as from April 8, 1998, until June

9   2007, when he remained housed in the general population.  Moreover, aside from the crisis

10   periods in 2007 and 2010, there were significant spans of time in which petitioner was treated at

11   the CCCMS level of care, and participated productively in prison jobs, and took college classes,

12   that required mental competence.  (ECF No. 21-11 at 2.)

13       Therefore, while petitioner suffered from a serious mental illness during the relevant

14   period, petitioner failed to demonstrate that his mental impairment was so severe that he was

15   unable to either understand the need to file or to personally prepare and file a habeas petition.

16   Accordingly, petitioner does not meet the first prong of the Bills test.

17                b.  Diligence

18       Petitioner has not established that he pursued his rights diligently.  See Bills, 628 F.3d at

19   1100 (petitioner "must diligently seek assistance and exploit whatever assistance is reasonably

20   available").  A petitioner may satisfy the diligence prong if "the petitioner's mental impairment

21   prevented him from locating assistance or communicating with or sufficiently supervising any

22   assistance actually found."  Id.

23       Here, petitioner has alleged no facts showing assistance was not reasonably available or

24   that his alleged mental problems prevented him from locating or communicating with others for

25   assistance in order to file a timely petition.  Review of the medical records demonstrates that

26   petitioner was able to communicate clearly with medical professionals concerning his health

27   issues.  Petitioner was housed in general population from February 24, 1998, to June 13, 2007, yet

28   he fails to explain why he was unable to obtain assistance during that time frame.  In addition,

1   while petitioner was housed in the general population at Pleasant Valley State Prison, he filed a

2   pro se petition for writ of habeas corpus in Case No. 2:00-cv-0431 GEB DAD on February 29,

3   2000.  Such filing demonstrates that petitioner was aware he needed to file a federal petition.

4   Moreover, on June 7, 2000, petitioner was cited the applicable statute, 28 U.S.C. § 2244(d), and

5   warned that there was a one year limitations period.  Case No. 2:00-cv-0431 GEB DAD (ECF No.

6   2 at 2).  Yet petitioner did not file objections or inform the court that he needed assistance in

7   pursuing habeas relief.

8           Further, petitioner's own explanation as to why his petition was untimely suggests that his

9   mental impairment was not the but-for cause of the delay in the filing of his federal petition.  See

10  Bills, 628 F.3d at 1100 ("The 'totality of the circumstances' inquiry in the second prong [of the

11  Bills test] "considers whether the petitioner's impairment was the but-for cause of any delay.").

12  In his opposition, petitioner explains that it was not until "he read some type of manual" and met

13  Stephen Snow that he understood the need to adequately prepare his legal papers to file in federal

14  court.  (ECF No. 22 at 36.)  Such explanation suggests that petitioner's ignorance of the law, and

15  not his mental illness, was the but-for cause of his failure to file a timely petition.  While

16  petitioner makes a general allegation that his mental illness caused his untimely filing,

17  petitioner's conclusory allegations do not establish a causal connection between his mental

18  impairments and his failure to file a timely petition.  Because petitioner has failed to establish a

19  causal link between his mental illness and his delay in filing his federal habeas petition, equitable

20  tolling is not warranted.  See Gaston v. Palmer, 417 F.3d 1030, 1034-35 (9th Cir. 2005)

21  (upholding a finding that equitable tolling was inapplicable where petitioner failed to show a

22  causal connection between physical and mental disabilities and inability to timely file petition),

23  modified on other grounds by, 447 F.3d 1165 (9th Cir.).  See also Jones v. Marshall, 2009 WL

24  2189892 at *9 n.13 (C.D. Cal. July 17, 2009) (rejecting claim for equitable tolling based on

25  alleged mental illness because petitioner failed to establish that his mental condition was the "but

26  for" cause of his failure to timely file a federal habeas petition.).

27          Finally, for at least part of the relevant time period, petitioner was working as a machinist

28  or a mechanic, in electrical and PC repair, as a teacher's aide or a porter (ECF Nos. 21-2 at 55,

1    58, 74, 77; 21-3 at 32; 21-11 at 2), and, while at MCSP, he was taking college classes (ECF No.

2    21-3 at 20).  Such activities suggest that petitioner's mental illness did not interfere with his

3    ability to locate or understand the need for assistance.  "Without any allegation or evidence of

4    how petitioner's symptoms actually caused him not to be able to file despite his diligence, the

5    court cannot find that he is entitled to equitable tolling."  Taylor v. Knowles, 2009 WL 688615, at

6    *6 (E.D. Cal. March 13, 2009), aff'd, 368 Fed. Appx. 796 (9th Cir. 2010) (no equitable tolling

7    where petitioner failed to show his auditory hallucinations, severe depression, and anxiety

8    "actually caused him not to be able to file despite his diligence"); see Howell v. Roe, 2003 WL

9    403353, *4 (N.D. Cal. Feb. 20, 2003) (rejecting equitable tolling where petitioner's suicidal

10   nature and depression did not make him mentally incompetent).

11          Accordingly, considering the totality of the circumstances pertinent to petitioner's ability

12   to file a timely petition, petitioner has not shown that he suffered from a mental impairment so

13   severe as to cause his untimely filing.  The record contradicts petitioner's general allegations that

14   side effects from the psychotropic medications impaired his ability to file his federal petition or to

15   seek assistance.  Further, considering the entire record, petitioner does not explain how his

16   condition actually caused him not to be able to file a petition despite the exercise of diligence.

17          For the reasons discussed above, the undersigned finds that petitioner is not entitled to

18   equitable tolling based on mental illness.[13]

19          C.  Inadequate Health Care

20          Petitioner also contends that the documented poor health care provided to state prison

21   inmates was an impediment to petitioner receiving adequate mental health care, citing the class

22

23   ───────────────────────

     [13]  An evidentiary hearing is not required to determine whether to allow equitable tolling on the
24   grounds of mental impairment where the petitioner's pertinent medical and prison records are
     submitted by the parties.  See Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010) (finding no
25   equitable tolling for mental impairment without conducting evidentiary hearing and based on
     review of records submitted with petition); see also Orthel v. Yates, 795 F.3d 939 (9th Cir. 2015)
26   (denying equitable tolling without evidentiary hearing based on review of voluminous mental
     health and prison records submitted by respondent).  Here, the parties submitted voluminous
27   mental health and prison records for the relevant period.  Because the record is sufficiently
     developed for the undersigned to conclude that petitioner's mental illness was not so severe as to
28   cause the untimely habeas petition, no evidentiary hearing is required.

1  actions Plata v. Schwarzenegger (medical care) and Coleman v. Schwarzenegger (mental health

2  care).  However, the parties submitted over 1000 pages of petitioner's mental health care records,

3  some of which were duplicates.  These documents demonstrate that petitioner has received

4  attentive and prolific mental health care during his incarceration, including the prescription of

5  psychotropic drugs, as well as their discontinuation when he so requested; and counseling and

6  psychotherapy, including group and one-on-one meetings with psych professionals on myriad

7  occasions.  Indeed, at one point, petitioner was attending seven different groups.  (ECF No. 22 at

8  102.)  On this record, petitioner's arguments concerning inadequate health care are unavailing.

9          D.  Actual Innocence

10         Petitioner claims that "the failure to consider his claims on the merits would result in a

11  fundamental miscarriage of justice."  (ECF No. 22 at 19.)  Respondent construes this statement as

12  a claim of actual innocence as an exception to the statute of limitations, but argues that petitioner

13  failed to present any new evidence in support thereof.  (ECF No. 29 at 8.)

14         The U.S. Supreme Court has agreed with the Ninth Circuit that the "actual innocence"

15  exception applies to the AEDPA's statute of limitations.  See McQuiggin v. Perkins, 133 S. Ct.

16  1924 (2013); Lee v. Lampert, 653 F.3d 929, 934 (9th Cir. 2011) (en banc).  "[A] credible claim of

17  actual innocence constitutes an equitable exception to AEDPA's limitations period, and a

18  petitioner who makes such a showing may pass through the Schlup gateway and have his

19  otherwise time-barred claims heard on the merits."  Lee, 653 F.3d at 932, citing Schlup v. Delo,

20  513 U.S. 298 (1995).  Under Schlup, a petitioner must produce sufficient proof of his actual

21  innocence to bring him "within the 'narrow class of cases . . . implicating a fundamental

22  miscarriage of justice.'" 513 U.S. at 314-15 (quoting McCleskey v. Zant, 499 U.S. 467 (1991)).

23  Evidence of innocence must be "so strong that a court cannot have confidence in the outcome of

24  the trial unless the court is also satisfied that the trial was free of nonharmless constitutional

25  error."  Schlup, 513 U.S. at 316.  To pass through the Schlup gateway, a "petitioner must show

26  that it is more likely than not that no reasonable juror would have convicted him in light of the

27  new evidence. . . ."  Id. at 327.

28  ////

1    Actual innocence in this context "means factual innocence, not mere legal insufficiency."

2    Bousley v. United States, 523 U.S. 614, 623-24 (1998); Jaramillo v. Stewart, 340 F.3d 877, 882-

3    83 (9th Cir. 2003) (accord).  To make a credible claim of actual innocence, petitioner must

4    produce "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy

5    eyewitness accounts, or critical physical evidence -- that was not presented at trial."  Schlup, 513

6    U.S. at 324.  The habeas court then considers all the evidence:  old and new, incriminating and

7    exculpatory, admissible at trial or not.  House v. Bell, 547 U.S. 518, 538 (2006).  On this

8    complete record, the court makes a "'probabilistic determination about what reasonable, properly

9    instructed jurors would do.'"  Id. (quoting Schlup, 513 U.S. at 329).  "The court's function is not

10   to make an independent factual determination about what likely occurred, but rather to assess the

11   likely impact of the evidence on reasonable jurors.  Id. (citing Schlup, 513 U.S. at 329.)

12    Petitioner has not provided any newly-discovered evidence which demonstrates that he is

13   factually innocent of the crimes for which he was convicted.  Thus, petitioner's claim fails.

14    E.  Impact of Prison Conditions

15    Petitioner alleges that the combination of solitary confinement in ad seg, admission to the

16   DMH VPP, prison lockdowns, lost legal papers, and the unavailability of AEDPA in the SVSP

17   law library also prevented petitioner from timely filing his federal petition.  (ECF No. 22 at 12.)

18   In his declaration, petitioner avers that while he was housed in MHCB's and in ad seg "in various

19   prisons," he had no access to his personal property.  (ECF No. 22 at 35.)  Petitioner declares that

20   from 1996 to 2015, he "lacked the understanding how to research the law, using the law books or

21   using the computers, to understand the need to prepare a habeas petition" in a timely manner.

22   (ECF No. 22 at 36.)

23    Jailhouse lawyer Snow declares that he was housed at SVSP from August 1996 to 2001.

24   (ECF No. 22 at 171.)  Although both Snow and petitioner were housed on Facility "A" yard,

25   Snow never met petitioner while Snow was at SVSP.  Snow avers that Facility "A" yard was on

26   lockdown for several months because of racial riots, and that he could only access the law library

27   if he could demonstrate a court deadline, and then only for two hours, once a week.  Snow

28   declares that there were other issues with the SVSP law library:  no computers; the law books

40

1    weren't updated; numerous cases were torn out of the law books; there were no law books

2    describing AEDPA's one year statute of limitations or concerning changes in habeas corpus law;

3    the library only had room for 8-10 inmates at a time, and it was years after AEDPA passed before

4    law library staff recognized that the AEDPA deadline should be a deadline to qualify for PLU

5    status.  (ECF No. 22 at 172.)

6         Respondent counters that petitioner's "kitchen-sink argument fails because petitioner

7    provides no specific dates or details about when these events occurred."  (ECF No. 29 at 4.)

8         To the extent that petitioner contends that the extraordinary circumstance was his lack of

9    understanding of the law, his claim for equitable tolling must fail.  Rasberry, 448 F.3d at 1154

10   (pro se petitioner's ignorance and confusion about the law not sufficient); see, e.g., Hughes v.

11   Idaho State Bd. of Corr., 800 F.2d 905, 909 (9th Cir. 1986) (pro se prisoner's illiteracy and lack

12   of knowledge of law unfortunate but insufficient to establish cause); Fisher v. Johnson, 174 F.3d

13   710 (5th Cir. 1999); Rose v. Dole, 945 F.2d 1331, 1335 (6th Cir. 1991).  Unpredictable

14   lockdowns or library closures do not constitute "extraordinary" circumstances warranting

15   equitable tolling.  See United States v. Van Poyck, 980 F.Supp. 1108, 1111 (C.D. Cal. 1997)

16   (inability to secure copies of transcripts from court reporters and lockdowns at prison lasting

17   several days and allegedly eliminating access to law library were not extraordinary circumstances

18   and did not equitably toll one-year statute of limitations); Atkins v. Harris, 1999 WL 13719, *2

19   (N.D. Cal. Jan. 7, 1999) ("lockdowns, restricted library access and transfers do not constitute

20   extraordinary circumstances sufficient to equitably toll the [AEDPA] statute of limitations.

21   Prisoners familiar with the routine restrictions of prison life must take such matters into account

22   when calculating when to file a federal [habeas] petition. . . .  Petitioner's alleged lack of legal

23   sophistication also does not excuse the delay."); Giraldes v. Ramirez-Palmer, 1998 WL 775085,

24   *2 (N.D. Cal. 1998) (holding that prison lockdowns do not constitute extraordinary circumstances

25   warranting equitable tolling).  This is because transfers, library closures, lockdowns, etc., are

26   regular facts of prison life for California state prisoners; thus, by definition, such circumstances

27   cannot be "extraordinary" such as to entitle an inmate to equitable tolling.

28   ////

Lack of access to legal materials may provide a basis for equitable tolling.  See Lott v. Mueller, 304 F.3d 918, 924 (9th Cir. 2002); Ramirez v. Yates, 571 F.3d 993, 998 (9th Cir. 2009) (finding that equitable tolling may apply where a complete lack of access to legal materials made timely filing impossible).  However, petitioner failed to demonstrate that the deprivation of his personal property took place during April 8, 1997, to April 8, 1998.  Moreover, his placement in MHCB's and the VPP did not occur until 2007 and 2010, long after the limitations period expired.  Petitioner failed to identify specific prisons or dates in which he was housed in ad seg and allegedly deprived of his personal property.  For these reasons, the undersigned finds that petitioner is not entitled to equitable tolling on this ground.  See Trenkler v. United States, 268 F.3d 16, 25 (1st Cir. 2001) (conclusory assertions rarely suffice to meet the burden of demonstrating entitlement to equitable tolling); Miller v. Marr, 141 F.3d 976, 978 (10th Cir. 1998) (denying equitable tolling when petitioner "provided no specificity regarding the alleged lack of access and the steps he took to diligently pursue his federal claims"); Williams v. Dexter, 649 F.Supp.2d 1055, 1061-62 (C.D. Cal. 2009) (inmate not entitled to equitable tolling when such "claim is. . . unsupported by competent evidence and is . . . conclusory").

Petitioner's claim that the law library at SVSP did not have law books describing AEDPA is pertinent, because petitioner was convicted on April 25, 1996, the day after AEDPA was enacted on April 24, 1996.  Thus, it is conceivable that prison law libraries did not yet have copies of AEDPA when petitioner was admitted to CDCR custody.  However, Snow did not provide the dates that no such law books describing AEDPA were in the SVSP library.  In addition, he does not aver that there were no copies of the statute posted or provided to the inmates.  Moreover, the limitations period did not begin to run until April 8, 1997, almost a year after AEDPA was enacted, and petitioner then had until April 8, 1998, in which to file his federal petition.  Snow avers it was "years" after AEDPA was enacted that the prison law librarians recognized this deadline for purposes of PLU status, after the Chief Law Librarian in Sacramento issued a memo describing the deadline.  But Snow did not provide a copy of the memo, or the date it issued.  Moreover, Snow and petitioner do not declare that there was no copy of AEDPA in the SVSP law library as of 1998.  Moreover, even if the law library at SVSP did not have a

1   copy of AEDPA, petitioner was transferred to PVSP on December 29, 1999, from where he filed,

2   in 2000, his prior federal petition, and was specifically informed about AEDPA.  Thus, petitioner

3   would not be entitled to tolling beyond 2000 in any event.

4       For all of the above reasons, petitioner is not entitled to equitable tolling for the seventeen

5   year delay in bringing this action.

6   IX.  Motion to Compel

7       A.  Parties' Positions

8       Petitioner seeks to compel mental health records from St. Joseph's Medical Center for

9   1992; from the Sacramento County Jail and the San Joaquin County Jail for 1995, 1996, and

10  1997; and from the California Department of Corrections and Rehabilitation for 1997 through

11  2010.  (ECF No. 27 at 1-2.)  He alleges that such records are relevant to his claim for equitable

12  tolling based on a severe mental impairment.  (ECF No. 27 at 1.)  Petitioner claims that there are

13  missing records which he believes are stored in archives at the CDCR's medical records

14  department.  (ECF Nos. 22 at 173-76; 27 at 4.)

15      Respondent counters that such records are either not directly relevant or have already been

16  provided.  (ECF No. 29 at 2.)  Petitioner was convicted in 1996; thus, respondent contends that

17  any records from 1992 pre-date his conviction.  Records from before 1997 pre-date the relevant

18  one year limitations period that ran from April 9, 1997, to April 8, 1998.  (ECF No. 29 at 2, citing

19  ECF No. 11 at 3.)  Further, respondent contends he requested and received petitioner's complete

20  mental health records from the beginning of his incarceration in 1996 to the present, and supplied

21  those records as Exhibit A to the reply to opposition filed on February 10, 2016.  (ECF No. 29 at

22  2, citing ECF No. 21 at Ex. A.)  Respondent provided a declaration from the custodian of records

23  from the Valley State Prison, confirming that petitioner's complete mental health record was

24  provided.  (ECF No. 21-1 at 2.)  Moreover, respondent argues that the records petitioner attached

25  to his supplemental opposition refute his claim that he suffered from a severe mental impairment

26  during the relevant time frame.  (ECF No. 29 at 3, citing ECF No. 22 at Ex. B.)  Thus, respondent

27  contends that petitioner's motion to compel should be denied.

28  ////

1       In reply, petitioner provided a corrected address for the production of the records, and

2  avers that "there is a hard copy of [his] medical and mental health records being stored at

3  [CDCR/Division of Correctional Health Care Services] that hasn't been scanned into the medical

4  computer," and believes "the hard copy will have [his] missing mental health records, as

5  described in [his] declaration" attached to his motion to compel.  (ECF No. 30 at 4.)  In his

6  declaration, petitioner avers that in 1992, he was admitted to the psychiatric ward for more than

7  30 days at San Joaquin Medical Center in Stockton, California, because of the death of his

8  mother.  (ECF No. 27 at 4.)  While housed in the San Joaquin and Sacramento County Jails,

9  petitioner received mental health treatment in 1995 through 1997.  (ECF No. 30 at 4.)  Petitioner

10  declares he was admitted to CDCR custody on or about June 21, 1996, and that since such

11  admission, petitioner avers he has consistently seen mental health professionals for his serious

12  mental disorders and/or to be prescribed psychotropic medications in 1996 up to today.  (ECF no.

13  27 at 4.)  Petitioner does not know or understand why there are allegedly missing mental health

14  records, but believes such records are missing for the time frame January 18, 2000, through July

15  9, 2010, and from March 6, 1997, through February 19, 1998.  (ECF No. 27 at 5.)  Petitioner

16  declares that during these time frames he was being seen by mental health professionals and/or

17  taking psychotropic medications for his serious mental disorders.  (ECF No. 27 at 5.)  However,

18  even if he wasn't being seen by mental health professionals or being prescribed psychotropic

19  medications, petitioner believes he was still suffering from serious mental disorders.  (Id.)

20  Petitioner believes there is a hard copy of his mental health records being stored by CDCR some

21  place other than in the computer at VSP in Chowchilla.

22       B.  Discussion

23       As argued by respondent, petitioner's mental health care prior to his admission to CDCR

24  custody and prior to the relevant time frame here, April 8, 1997, are not relevant.  Therefore,

25  petitioner's motion to compel mental health records from the San Joaquin hospital, and the San

26  Joaquin and Sacramento County Jails is denied.

27       With regard to petitioner's contention that certain mental health care records are missing

28  from the CDCR records provided, he submitted only his own conclusory declaration.  Petitioner

1   does not name any of the mental health professionals he alleged treated him from April 8, 1997,

2   to February 19, 1998, if any, or from January 18, 2000, through July 9, 2010, or offer the name of

3   any psychotropic medication he alleges he was prescribed during such time frames that are not

4   included in the records provided, if any.  That said, it appears that there are some records missing

5   from the 2007-15 time frame, inasmuch as there are gaps in time in the records where petitioner is

6   taking different medications, but there is no record reflecting the change.  See, e.g., October 15,

7   2007 started on Remeron (ECF No. 21-1 at 35); on October 26, 2007, petitioner was taking Paxil,

8   Propranolol, Risperdal (antipsychotic), Wellbutrin, and Remeron (ECF No. 17 at 127.)

9       However, respondent adduced evidence that petitioner was housed in general population

10  from February 24, 1998, through March 16, 2007.  (ECF No. 21-9 at 3-4.)  Petitioner does not

11  demonstrate how he could have been housed in general population during such periods if he was

12  so severely mentally ill.

13      Finally, as set forth more in detail above, the mental health records that were provided

14  demonstrate that although petitioner suffered from a serious mental illness, he was able to

15  function.  He is college educated.  Petitioner was able to articulate his concern about certain drugs

16  causing him to gain weight.  He realized the importance of losing weight, and began his own

17  program of exercise, running, working out, and yoga, that resulted in a 50 pound weight loss.  He

18  refrained from taking certain medication when he believed it had a negative impact on him and

19  sought changes in his mental health care when he, in his opinion, deemed it necessary.  Although

20  petitioner did suffer incidents of suicide attempts, as well as periods of crisis where he was

21  admitted to the VPP, and to MHCBs on several occasions, the record reflects that petitioner was

22  relatively stable throughout the limitations period, his cognition was not impaired, and he was

23  able to function.  Thus, petitioner's motion to compel the production of further medical records is

24  denied as unnecessary.

25  X.  Conclusion

26      For the reasons discussed above, the undersigned finds that this action is barred by the

27  statute of limitations, and petitioner should not be granted equitable tolling for the 17 year delay.

28  In addition, petitioner's motion to compel the production of additional mental health records is

1   denied.

2       Accordingly, IT IS HEREBY ORDERED that petitioner's motion to compel (ECF No.

3   27) is denied; and

4       IT IS RECOMMENDED that:

5       1.  Respondent's motion to dismiss (ECF No. 11) be granted; and

6       2.  This action be dismissed.

7       These findings and recommendations are submitted to the United States District Judge

8   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9   after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

12  he shall also address whether a certificate of appealability should issue and, if so, why and as to

13  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

14  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

15  § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

16  service of the objections.  The parties are advised that failure to file objections within the

17  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

18  F.2d 1153 (9th Cir. 1991).

19  Dated:  August 10, 2016

20

21                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE
22  /port1817.mtd.hc.sol

23

24

25

26

27

28

                                    46